**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Willard Carl BUSH, Defendant-
Appellant.**

**No. 72-2687.**

United States Court of Appeals,
Fifth Circuit.

Nov. 13, 1974.

---

Roney, Circuit Judge, filed a dissenting opinion.

Richard V. Burnes, Alexandria, La., for defendant-appellant.

Donald E. Walter, U. S. Atty., R. Perry Pringle, Asst. U. S. Atty., Shreveport, La., for plaintiff-appellee.

Before COLEMAN, MORGAN and RONEY, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge.

While investigating the tax returns of Victor J. Carona, the Internal Revenue Service discovered evidence of possible kickbacks paid Carona by Willard Carl Bush. Carona supposedly had a great amount of influence over the Jefferson Parish School Board, which was considering the purchase of a number of mobile classrooms for their school system. Bush was in the business of selling such classrooms. Apparently the purpose of the kickbacks was to obtain Carona's influence so that Bush would be sure to obtain the mobile classroom order. While interviewing Bush, the IRS obtained two sworn affidavits, both of which in essence stated that Bush paid no kickbacks to Carona.

Bush was then indicted for violating 18 U.S.C. § 1001, relative to false statements. He was convicted by a jury trial and sentenced to two years imprisonment. This appeal followed.

Bush bases his appeal on two grounds: (1) That the first affidavit he gave the IRS was barred by the running of the statute of limitations and the second affidavit, being supplemental to the first, was therefore also barred; (2) that prejudicial conduct of the prosecutor prevented Bush from having a fair trial. This court must also decide the additional question, "Are the facts in this case such that they come under 18 U.S.C. § 1001, concerning false statements?"

If 18 U.S.C. § 1001 does not apply, then Bush should never have been prosecuted and this case should be dismissed. therefore, that is the threshold question that must be considered by this court.

The present 18 U.S.C. § 1001 had its origin over 100 years ago in the wake of a spate of frauds on the government. United States v. Bramblett, 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955). The original provision clearly covered the presentation of false claims against any component of the government to any officer of the government. *Bramblett, supra.* The prohibitions of the statute were broad, although its application was limited to military personnel. *Bramblett, supra.* False statements made for the purpose of obtaining the approval of payment of any claim were also proscribed. *Bramblett, supra.*

In 1909, the false claim provision was extended to cover corporations in which the United States held stock, and false statements were proscribed if made "for the purpose and with the intent of cheating and swindling or defrauding the Government of the United States," as well as where made for the purpose of obtaining payment of a false claim. *Bramblett, supra,* at 506, Fn. 2, 75 S.Ct. at 506. In 1934, no change was made in the false claim portion of the statute, but the false statement section was amended so as to delete all words as to purpose, and to insert "In any matter

within the jurisdiction of any department or agency of the United States or any corporation in which the United States of America is a stockholder." United States v. Stark, 131 F.Supp. 190 (D.C.1955). This revision, largely the product of the urging of the Secretary of the Interior, was presumably for the purpose of broadening the statute so as to reach not only false statements in connection with a claim against the government, but also in connection with non-monetary frauds, such as those involved in the "hot oil" shipments. United States v. Gilliland, 312 U.S. 86, 61 S. Ct. 518, 85 L.Ed. 598 (1941). Thus, included were statements including no pecuniary loss to the government, but which by their falseness and their reliance intended thereon perverted the function of some governmental agency. *Gilliland, supra.*

In 1948, the statute was put into present form, the false claim provision becoming 18 U.S.C. § 287, and the false statements provision becoming 18 U.S.C. § 1001. *Bramblett, supra.*

Section 1001 has usually been held inapplicable to statements made to government agents acting in a purely "police" capacity. United States v. Philippe (D. C.S.D.N.Y.1959), 173 F.Supp. 582. Doubts as to whether false statements made to police agents of the federal government fall within the purview of 18 U.S.C. § 1001 are premised on a potential "investigative" exception to § 1001, based on its historical evolution as a statute seeking to prevent the administration of federal government programs from being subverted or frustrated by the false presentation of interested parties. United States v. Philippe, *supra*; Paternostro v. United States, 311 F.2d 298 (5 Cir., 1962).

Although the line between "administration" and "investigation" cannot be sharply drawn, the argument has been made that this statute was intended to apply only to federal government "administration" and not intended to compel citizens to answer truthfully every question put to them in the course of a federal police or federal criminal investigation. United States v. Levin, 133 F. Supp. 88 (D.C.1953). Otherwise, the contention is, the statute with its harsh maximum penalties would give powerful impetus to inquisition as a method of criminal investigation. *Levin, supra.* The exact scope of this possible "investigative" exception to 18 U.S.C. § 1001 has not been clearly established; more importantly, its potential application would in any event turn upon the peculiar facts of a given case.

It is necessary at this point to review the facts of the case before us in some detail so as to determine whether 18 U. S.C. § 1001 should be applied to this situation.

On March 24, 1965, two special agents of the Internal Revenue Service, Intelligence Division, went to Bush's office in Alexandria, Louisiana, displayed their pocket commissions identifying themselves, and told Mr. Bush that they were verifying the tax returns of Victor J. Carona. In connection with that investigation, they wanted to talk to Bush, examine certain documents and review his records relating to a transaction which had allegedly taken place with respect to commissions paid on portable classrooms sold to the Jefferson Parish School Board. One of the agents displayed documents relating to the transaction, conducted an oral interview, reduced the oral interview into a written affidavit, administered an oath to the witness, and had the witness execute the affidavit. After all this had occurred, one of the agents requested permission to take certain records belonging to defendant with him and Bush agreed. It should be emphasized at this point that the affidavit taken on March 24, 1965, is not the affidavit under which Mr. Bush was indicted, the appropriate statute of limitations having run. See, 18 U.S.C. § 3282.

One year and 15 days later, two special agents of the Internal Revenue Service again appeared in Mr. Bush's offices. They returned Bush's records that had been taken on the first visit

and prepared another affidavit which they had Bush sign. There is no evidence to indicate that the agents warned Bush he was under investigation or that suspicion had focused upon him because of possible violation of a section of the United States Criminal Code. A comparison of the first and second affidavits shows, however, that the Internal Revenue Service was now focusing its attention on certain transactions between Bush and Carona and further that the agents had good reason to believe that the specific transactions in question involved the attempt by Bush to secretly pay off Carona.[1]

1. The text of the second affidavit typed by the IRS special agent and signed by Bush is set out below:

U. S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

**AFFIDAVIT**

MAY 15 1972

United States of America Western )
Judicial , District of Louisiana ss

ALTON V. CURTIS CLERK

I, W. Carl Bush By ............................. , state that:
Deputy

I reside at Alexandria, Louisiana .

This affidavit is supplemental to the affidavit given to Special Agents Wingard and Burns on March 24, 1965.

In the original affidavit, page 1, paragraph 4, I stated that I was not certain as to whether I knew Victor J. Carona. Since making this statement, I have learned that Mr. Carona is an uncle of the individual from whom I rent my lot and building at 1125 Airline Highway, Kenner, Louisiana. I know now that I have observed Mr. Carona around my Kenner, Louisiana office on the occasions of my visitation to that city. He is also on Veterans Highway as described in my affidavit of March 24, 1965. However, I never had any other business dealings with Mr. Carona or an entity called Victor J. Carona or Carona Brokerage Company.

I have been shown what purports to be a letter, dated October 18, 1962, which allegedly originated from me, and was sent to Lloyd Stinson, Wayne Works, Richmond, Indiana, wherein I allegedly instructed Mr. Stinson to mail me a group of checks, including one to the Carona Brokerage Company in the amount of $30,800.00. I have been asked whether I wrote the letter in question. My answer is that I won't say I did, and I won't say I didn't. The signature shown on the letter appears to be mine, but unless I could examine the original letter, I would not know for sure. I do not remember having written the letter. I do not remember receiving the checks listed in the letter. For purposes of identification and at the request of Special Agents Wingard and Maltempi I have placed my initials on the letter described in this paragraph and the date of my action.

I have been shown what purports to be a letter, dated October 31, 1962, which allegedly originated from me, and was sent to Lloyd Stinson, wherein I allegedly returned the group of checks described above, including the one in the amount of $30,800.00, made out to the Carona Brokerage Company, and asked that the checks be reissued. According to the letter which I was allowed to examine, I instructed Mr. Stinson to cancel the $30,800.00 check payable to Carona Brokerage Company and issue two (2) checks, each in the amount of $15,400.00, to Charles Zappala and Anthony Callamia, respectively. I do not recall writing the letter in question. I have no idea why the two (2) $15,400.00 checks were issued to the payees shown and substituted for the $30,800.00 check to Carona Brokerage Company. Mr. Carona did not ask me to do this. I know of no arrangements Mr. Carona may or may not have had with Messrs. Zappala and Callamia. I had no arrangements with either of the three. In fact I do not know either Messrs. Zappala or Callamia. I have never had any dealings with either Messrs. Zappala or Callamia. For purposes of identification and at the request of Special Agents Wingard and Maltempi, I have placed my initials on the letter described in this paragraph and the date of my actions.

This court would be hard put were it asked to believe that at this specific point in time the Internal Revenue Service was not at least aware that Bush might be involved in illegal dealings. It is also incomprehensible to think that the IRS did not suspect Bush of swearing to statements which were not completely true.

In most cases courts have refused to apply 18 U.S.C. § 1001 to false information given to "special investigatory" In-

Supplemental Affidavit of W. Carl Bush     -2-

I have been shown photocopies of what purports to be a group of checks, issued by Divco-Wayne Corporation, Richmond, Indiana, a description of which follows:

| Date of Check | Check No. | Payee | Amount |
|---|---|---|---|
| (1) November 8, 1962 | 13,935 | Louisiana Dept. of Revenue | $8,031.64 |
| (2) November 8, 1962 | 13,936 | Revenue Department | 4,015.81 |
| (3) November 8, 1962 | 13,937 | Anthony Callamia | 15,400.00 |
| (4) November 8, 1962 | 13,938 | Herb Sieger | 6,100.00 |
| (5) November 8, 1962 | 13,939 | Carl Bush | 11,825.87 |
| (6) November 8, 1962 | 13,940 | Charles Zappala | 15,400.00 |

I have been asked to examine the afore described checks; the endorsements shown thereon; and describe my actions in the destribution. First of all, the only one of the checks which I recall receiving is the one made payable to me (Item 5 above). I do not recall ever having received any of the other checks. I do not recall ever having seen the checks made payable to Messrs. Callamia and Zappala. I did not deliver or mail the checks to Messrs. Callamia and/or Zappala. I did not turn over the checks to anyone else with instructions to deliver or mail the checks to Messrs. Callamia and/or Zappala. In fact, I know nothing about the monies which were allegedly paid to Messrs. Callamia and/or Zappala, or what the payment was for. I know of no service or labor which Messrs. Callamia and/or Zappala may or may not have performed in connection with the sale of the portable classrooms to the Jefferson Parish School Board. If Messrs. Callamia or Zappala were engaged to perform some service in connection with the sale of the portable classrooms, I have no knowledge of it. They definitely were not engaged by me. Neither have I ever approached or contacted Messrs. Callamia and Zappala and promised them a commission if my company was the successful bidder on the sale of the portable classrooms. I have never authorized anyother party or parties to promise Messrs. Callamia and Zappala a commission. For the purposes of identification, and at the request of Special Agents Wingard and Maltempi, I have place my initials on the photocopies of checks described herein and the date of my actions.

I have read the foregoing statement consisting of __2__ pages, each of which I have signed. I fully understand this statement and it is true, accurate and complete to the best of my knowledge and belief I made the corrections shown and placed my initials opposite each.

I made this statement freely and voluntarily without any threats or rewards, or promises of reward having been made to me in return for it.

Subscribed and sworn to before me this __2d__ day of __April__, 19_66_, at __Alexandria, Louisiana__

M. D. Wingard
(Signature)

Special Agent
(Title)

Internal Revenue Service

(Signature of affiant)

(Signature of witness, if any)

ternal Revenue Service agents, strictly construing "statement" and "jurisdiction" as used in § 1001.[2]

In the Fifth Circuit case of Paternostro v. United States, *supra*, this circuit held that exculpatory "no" answer without an affirmative, aggressive, or overt misstatement on the part of the defendant did not come under the scope of 18 U.S.C. § 1001, and therefore reversed the conviction of the defendant, who had been convicted for his denials while under oath during an investigation by a special agent of the Intelligence Division of the IRS concerning whether he had solicited, received, or had any personal knowledge of "graft money" being distributed among the members of the New Orleans police force. The court noted that the Internal Revenue agent who initiated the interview was performing essentially the function of a policeman or investigative agent of the government and concluded that the same rules should apply to all policemen, whether government agent acting in this capacity to whom the answer is given is an agent of the FBI, a policeman, or an Internal Revenue agent.

The fact situation facing us is identical to the one in *Paternostro, supra*. Bush was approached by the Internal Revenue Service, the interview was initiated by the Internal Revenue Service, the essence of Bush's statements were an exculpatory "no" to the questions asked by the agent.

Judge Gewin's very able opinion in *Paternostro, supra*, easily distinguishes cases wherein a false written net worth statement was voluntarily prepared and submitted to the Internal Revenue agents for the purpose of misleading the IRS. Judge Gewin's statement at

page 305 can be applied to Bush as easily as it was to Paternostro:

> The appellant in the case at bar made no statement relating to any claim on his behalf against the United States or any agency thereof; he was not seeking to obtain or retain any official position or employment in any agency or department of the Federal Government; and *he did not aggressively and deliberately initiate any positive or affirmative statement calculated to pervert the legislative functions of government.* At most, assuming that appellant's answers to the agent were proved to be false by believable and substantial evidence, considering all he said, the answers were mere negative responses to questions propounded to him by an investigating agent during a question and answer conference, not initiated by the appellant. We conclude that the court erred in failing to dismiss . . . . [emphasis added].

It should be noted that there is a valid distinction between negative exculpatory denial of a suspected misdeed and an affirmative representation of facts peculiarly within the knowledge of the suspect not otherwise obtainable by the investigator.

This court is also well aware of that portion of the Fifth Amendment to the United States Constitution which says, "No person . . . shall be compelled in any criminal case to be a witness against himself, . . ." See, United States v. Davey (D.C.S.D.N.Y.1957), 155 F.Supp. 175. If, then, under the facts before us we allow Bush's conviction to stand, Bush will have been convicted by his own words given to an investigating officer of the United States government, who at the time suspected Bush of unlawful activity. None of the evidence

2. Only those cases in which the IRS agent is acting as a "policeman" are germane here. Most often, however, the merely "administrative" nature of such an agent is far removed from the basic situation which the "investigative exception" would cover, that

is of a citizen directly approached by a law enforcement agent and asked incriminating questions by such agent. See, Paternostro v. United States, 311 F.2d 298 (5 Cir., 1962).

gives any indication that Bush knew he was under suspicion, or that he had a right to remain silent in order to avoid self-incrimination.

The specific facts of the case before us can lead to only one conclusion: Bush cannot be prosecuted for making a statement to Internal Revenue Service agents when those agents aggressively sought such statement, when Bush's answer was essentially an exculpatory "no" as to possible criminal activity, and when there is a high likelihood that Bush was under suspicion himself at the time the statement was taken and yet was in no way warned of this possibility.

It must be emphasized that this opinion speaks only to the specific facts before us. We in no way attempt or intend to make any broad pronouncement as to the jurisdiction and application of 18 U.S.C. § 1001. As to cases which might appear contra to this opinion, we can only say, as the court held in *Paternostro, supra,* at 311 F.2d at 305:

> While we have not made a detailed review of every case in which the statute involved has been considered, we have given consideration to many of the leading cases. The opinions indicate some conflict in the reasoning employed by the various courts, but such apparent conflicts arise out of distinguishing facts rather than a fundamental interpretation of the statute. Our review of the legislative history of the statute and the purposes it seeks to accomplish lead us to the conclusion that in the circumstances and under the facts of the instant case, the reasoning of the courts in the *Stark, Levin, Davey, Philippe,* and *Allen* [United States v. Allen, D. C., 193 F.Supp. 954] cases and the principles there pronounced should be applied to the factual situation involving the appellant. . . .

It is the decision of this court that 18 U.S.C. § 1001 simply does not apply to the fact situation before us. Consideration of Appellant Bush's contentions of error are therefore pretermitted.

The decision of the court below is reversed and the case is remanded for the purpose of dismissal.

RONEY, Circuit Judge (dissenting):

I respectfully dissent. United States v. Lambert, 501 F.2d 943 (5th Cir. 1974), leaves no doubt in my mind that 18 U.S.C. § 1001 properly applies to statements made to the Internal Revenue Service. I agree with the majority to this extent. I do not agree, however, that the lengthy written statement made by Bush was equivalent to the exculpatory "no" dealt with in Paternostro v. United States, 311 F.2d 298 (5th Cir. 1962). The affidavit contained affirmative statements of false facts which the jury found to have been made willfully. That appears to me to be what Congress proscribed when it passed the 1970 version of 18 U.S.C. § 1001. *Cf.* United States v. Beacon Brass Co., Inc., 344 U.S. 43, 73 S.Ct. 77, 97 L.Ed. 61 (1952); United States v. Gilliland, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1941); United States v. McCue, 301 F.2d 452 (2d Cir.), cert. denied, 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808 (1962); Cooper v. United States, 282 F.2d 527 (9th Cir. 1960); Brandow v. United States, 268 F.2d 559 (9th Cir. 1959); Pitts v. United States, 263 F.2d 353 (9th Cir.), cert. denied, 360 U.S. 935, 79 S.Ct. 1457, 3 L.Ed.2d 1547 (1959); Smith v. United States, 257 F.2d 133 (10th Cir. 1958); Marzani v. United States, 83 U.S.App. D.C. 78, 168 F.2d 133, aff'd by equal divided court, 335 U.S. 895, 69 S.Ct. 299, 93 L.Ed. 431 (1948). *But see* United States v. Bedore, 455 F.2d 1109 (9th Cir. 1972).

Neither Bush nor the Government argued the above ground for reversal. Inasmuch as I agree with appellant Bush's arguments that he is entitled to a new trial because of numerous trial errors, however, I would set aside his conviction and leave the way open for a new trial.