**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Mary Neil TABOR,**
**Defendant-Appellant.**

**No. 85–5180.**

United States Court of Appeals,
Eleventh Circuit.

May 6, 1986.

---

William Norris, Leon B. Kellner, Linda Collins Hertz, Nancy L. Worthington, David O. Leiwant, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Michael Tarkoff, Miami, Fla., for defendant-appellant.

Before GODBOLD, Chief Judge, FAY, Circuit Judge, and PECK *, Senior Circuit Judge.

* Honorable John W. Peck, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

1. Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a

GODBOLD, Chief Judge:

18 U.S.C. § 1001 makes it criminal to knowingly and willfully give a false statement to a department or agency of the United States in any matter within the jurisdiction of the department or agency.[1] In cases that have come to be described as "exculpatory no" cases the federal courts have held that in some circumstances false statements exculpatory in nature, though made to a department or agency of the United States, are not criminalized by § 1001.

A jury convicted Mary Nell Tabor on two counts of making false statements to a government officer in violation of § 1001. Tabor raised the applicability of the "exculpatory no" doctrine by a timely pretrial motion to dismiss the indictment and by appropriate motions for judgment of acquittal, all of which were denied. We hold that the motions for judgment of acquittal should have been granted, reverse the conviction, and direct entry of a judgment of acquittal.

The facts are not in dispute. This case arose out of an Internal Revenue Service criminal investigation of Forest Weeks. Weeks had purchased real estate in Florida from Dorothy Martin and had given Martin a purchase money mortgage for $28,000. The signature of Martin on the deed to Weeks had been witnessed by Martin's niece, Leone Wolchko. Later a written satisfaction of the mortgage was recorded, purporting to have been signed by Martin and witnessed by Wolchko and Robert Wells. The satisfaction was "notarized" by Tabor, a notary public; that is, Tabor certified on the instrument itself that the signatories personally appeared before her and executed the instrument, and she attached her notarial seal.

material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Florida Statute Ann. § 117.09 (1982) provided:

> (1) Every notary public in the state shall require reasonable proof of the identity of the person whose signature is being notarized and such person must be in the presence of the notary public at the time the signature is notarized. Any notary public violating the above provision shall be guilty of a misdemeanor of the second degree, punishable as provided in § 755.082 or § 755.-093. It shall be no defense under this section that the notary public acted without intent to defraud.
>
> (2) Any notary public in this state who shall falsely or fraudulently take any acknowledgement of any instrument as a notary public or who falsely or fraudulently makes any certificate as a notary public or who falsely takes or receives an acknowledgement of the signature on any written instrument shall be guilty of a felony of the third degree, punishable as provided in § 775.082, § 775.083, or § 775.084.

In 1983 the IRS special agent investigating the case, Michael Sankey, went to Tabor's home accompanied by a deputy sheriff. Sankey told Tabor that he was investigating Weeks for criminal tax violations, but he did not tell her that she was under investigation. Previously Sankey had familiarized himself with the legal requirements imposed upon a notary under the laws of Florida and specifically was aware that it was necessary that a signatory execute the document in the presence of the notary and that the notary must require reasonable proof of the identity of the signatory.

In response to Sankey's questions Tabor stated that she was a notary and that her stamp had expired in 1986. She described the procedure she used in notarizing documents. She would only notarize a document after she had witnessed the signatures. She never notarized blank documents, and before notarizing a person's signature would check the person's identification. Tabor said that she was aware of her responsibilities under the law and never deviated from them.

After receiving these answers to his preliminary questions, Sankey showed Tabor a copy of the satisfaction of mortgage and asked her if she had notarized it. She told him that, although she could not remember doing so, she must have notarized the signatures because the document bore her signature and her seal. Sankey then asked Tabor if she would have required Martin and Wolchko to appear before her and sign the document in her presence and produce identification before she would sign as notary, and Tabor replied that she would have. She then stated that Martin and Wolchko had appeared before her and had signed the satisfaction of mortgage. In fact Martin had died five weeks before the document was signed, and Wolchko had not appeared before Tabor. The signatures of Martin and Wolchko were false, mere tracings made from their signatures on the Martin-Weeks deed. In fact, Tabor had signed as notary at the request of Weeks, who had brought the document to her.

Tabor was indicted under § 1001 in two counts. Count I charged that she had falsely stated that Martin appeared before her, presented proof of identity and signed the satisfaction of mortgage when in fact, as Tabor knew, Martin had not appeared, had not presented proof of identity, and had not signed the satisfaction. Count II contained parallel allegations relating to Wolchko.

The history of the development of § 1001 is described in the decision of the Fifth Circuit in *U.S. v. Bush*, 503 F.2d 813, 814–15 (5th Cir.1974).

> The present 18 U.S.C. § 1001 had its origin over 100 years ago in the wake of a spate of frauds on the government. *United States v. Bramblett*, 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955). The original provision clearly covered the presentation of false claims against any component of the government to any officer of the government. *Bramblett, supra.* The prohibitions of the statute were broad, although its application was

limited to military personnel. *Bramblett, supra.* False statements made for the purpose of obtaining the approval of payment of any claim were also proscribed. *Bramblett, supra.*

In 1909, the false claim provision was extended to cover corporations in which the United States held stock, and false statements were proscribed if made "for the purpose and with the intent of cheating and swindling or defrauding the Government of the United States," as well as where made for the purpose of obtaining payment of a false claim. *Bramblett, supra,* at 506, Fn. 2, 75 S.Ct. at 506. In 1934, no change was made in the false claim portion of the statute, but the false statement section was amended so as to delete all words as to purpose, and to insert "In any matter within the jurisdiction of any department or agency of the United States or any corporation in which the United States of America is a stockholder." *United States v. Stark,* 131 F.Supp. 190 (D.C.1955). This revision, largely the product of the urging of the Secretary of the Interior, was presumably for the purpose of broadening the statute so as to reach not only false statements in connection with a claim against the government, but also in connection with non-monetary frauds, such as those involved in the "hot oil" shipments. *United States v. Gilliland,* 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1941). Thus, included were statements including no pecuniary loss to the government, but which by their falseness and their reliance intended thereon perverted the function of some governmental agency. *Gilliland, supra.*

In 1948, the statute was put into present form, the false claim provision becoming 18 U.S.C. § 287, and the false statements provision becoming 18 U.S.C. 1001. *Bramblett, supra.*

Since § 1001 took its present form in 1948 the Fifth Circuit has laid out its "exculpatory no" doctrine, first under a rationale that Congress had not intended that the particular statements involved be included within § 1001, and later under an additional rationale that application of the statute under the circumstances was proscribed by considerations underlying the Fifth Amendment.

In *Paternostro v. U.S.,* 311 F.2d 298 (5th Cir.1962) in an IRS investigation defendant had falsely denied under oath that he had solicited, received or had knowledge of graft money distributed among members of the New Orleans police force. The court, speaking through Judge Gewin, noted that the IRS agent was performing essentially the function of a policeman or investigative officer of the government. The court distinguished this situation from that of one making a claim against the government, or seeking government employment, or aggressively and deliberately initiating a "positive or affirmative statement calculated to pervert the legislative functions of Government." *Id.* at 305. The court described defendant's answers as "mere negative responses to questions propounded to him by an investigating agent during a question and answer conference, not initiated by the [defendant]." *Id. Paternostro* rested upon the court's review of the legislative history and the purposes the statute sought to accomplish. *Id.* The government has not mentioned *Paternostro* in its brief.

*U.S. v. Lambert,* 501 F.2d 943 (5th Cir. 1974) (en banc) concerned a false statement made to the FBI but affirmatively initiated by the defendant and charging others with crime rather than exculpating himself. The defendant was charged with having gone to the FBI where he made a complaint that officers had mistreated him and violated his "civil rights." The court held that defendant's giving the statement was a "matter within the jurisdiction" of a federal agency as provided by § 1001. The conviction was reversed, however, because there was a fatal variance between indictment and proof. Seven of 17 judges concurred in vacation and remand but dissented on the ground that § 1001 did not apply to the statements because they did not "pervert" the normal functioning of the FBI.

*Lambert* is significant, however, because it both distinguished and reaffirmed *Paternostro*.

In reaching our conclusion we intend no violence to *Paternostro v. United States,* 311 F.2d 298 (CA5, 1962). There we held, like several other courts before and since,[3] that a generally negative and exculpatory response made by a subject of a criminal investigation in reply to questions directed to him by investigating officers is not a crime under § 1001. *Paternostro* construed the word "statement," not the phrase "in any matter within the jurisdiction" of a federal body. We note, too, that an exculpatory denial by a person under investigation may have less potential for misleading the Bureau and perverting its function than a discursive voluntary statement involving the suggestion that persons other than the maker of the statement are guilty of federal crimes. (Footnote 4 omitted, see below.)

---

[3] *See, e.g., United States v. Bedore,* 455 F.2d 1109 (CA9, 1972); *United States v. Stark,* 131 F.Supp. 190 (D.Md.1955).

501 F.2d at 946. In addition to reaffirming *Paternostro,* by footnote 4 the *Lambert* court noted an additional rationale for the "exculpatory no" exception to § 1001:

Undoubtedly the judicial gloss put on § 1001 by the "exculpatory no" decisions originates at least in part from latent distaste for an application of the statute that is uncomfortably close to the Fifth Amendment.

*Id.* at 946, n. 4.

*U.S. v. Bush, supra,* followed soon after *Lambert.* Like *Paternostro,* the government has not mentioned this case. Bush was approached by two IRS agents who told him that they were involved in the investigation of Carona and wanted to talk to him concerning dealings he had with Carona. At no time was he informed that he was under investigation. After conversing with Bush the agents drafted an affidavit detailing the events of the conversation. Bush signed it. He later signed a second affidavit that also recounted his conversa-

tion with the IRS agents. The statements in the affidavits were essentially negative responses to questions offered by the agents. 503 F.2d at 815–17. The former Fifth Circuit, relying on the "exculpatory no" doctrine, reversed Bush's conviction for statements contained in the affidavits. It held:

Bush cannot be prosecuted for making a statement to Internal Revenue Service agents when those agents aggressively sought such statement, when Bush's answer was essentially an exculpatory "no" as to possible criminal activity, and when there is a high likelihood that Bush was under suspicion himself at the time the statement was taken and yet was in no way warned of this possibility.

*Id.* at 819.

In this case Agent Sankey sought out Tabor for questioning after acquainting himself with the legal requirements imposed on her as a notary. His testimony at trial reveals that Tabor did no more than disclaim involvement in possible criminal activity. Further, when Sankey approached Tabor he knew that the signatures of Martin and Wolchko were forged, that neither had personally appeared before Tabor, and that Tabor could not have been misled by identification papers in the hands of someone other than Martin and Wolchko because the identification papers of neither had been lost. Thus Tabor was under direct suspicion of having violated the Florida criminal law. Despite this knowledge Sankey never warned Tabor of the possible consequences of her statements.

The government takes its stand for affirmance on this court's decision in *U.S. v. Payne,* 750 F.2d 844 (11th Cir.1985). There we faced the issue of whether the "exculpatory no" doctrine should be extended to convictions under 18 U.S.C. § 1006. The court reviewed the history of the doctrine and the decisions in *Paternostro, Lambert,* and *Bush.* It recognized the original rationale excluding "mere negative responses" to questions propounded by an investigating agent during a question and answer

conference not initiated by the defendant. It recognized the additional rationale, rooted in the Fifth Amendment, that had been set out in footnote 4 to *Lambert.* The government contended that the "exculpatory no" doctrine was designed to limit the broad scope of § 1001 and would be inappropriate as a limitation on a narrow false statement statute such as § 1006. *Id.* at 862. We rejected this argument because it addressed only the first rationale for the doctrine (mere negative responses), which might be outside the intended scope of a particular statute, and did not address the second basis, the concern with according due weight to Fifth Amendment values. We held that this second justification applied with equal force to prosecutions under § 1006 and thus extended the doctrine to that section. But because this extension was based solely on the Fifth Amendment justification, we limited the application of the doctrine in § 1006 cases to those where the Fifth Amendment's concern with self-incrimination was implicated. We held that

the "exculpatory no" doctrine requires the reversal of a false statement conviction under 18 U.S.C. § 1006 only if truthful affirmative answers would have been incriminating, or if the defendant can establish that he or she reasonably believed that truthful affirmative answers would have been incriminating.

The government suggests that Tabor cannot meet the standard of *Payne* because she offered no evidence that she knew her answers would incriminate her or that she had a reasonable belief that truthful answers would have incriminated her. We need not decide whether this factual contention is correct because the *Payne* standard does not apply to Tabor, who was convicted under § 1001, not § 1006. *Payne* did not purport to alter the scope of the "exculpatory no" doctrine in § 1001 cases but reaffirmed it and took great care in noting the difference between that section and § 1006 and adjusted the standard for the latter accordingly.

Here, as in *Bush* and *Paternostro*, the agent, acting in a police role, aggressively sought a statement from a person under suspicion and not warned. The answer was essentially an exculpatory "no" as to possible criminal activity. All of the bases for the exception to § 1001 apply here.

The judgment of conviction is REVERSED and the district court is directed to enter a judgment of acquittal.