Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

The **UNITED STATES of America**

v.

**Felix TAYLOR.**

**No. LR–CR–89–52.**

United States District Court,
E.D. Arkansas, W.D.

Sept. 8, 1989.

Patrick Harris, Asst. U.S. Atty., Little Rock, Ark., for plaintiff.

Richard Holiman, Little Rock, Ark., for defendant.

## MEMORANDUM AND ORDER

EISELE, Chief Judge.

The defendant, Mr. Felix Taylor, has been charged in a three-count indictment with making certain false statements and representations in connection with a bankruptcy proceeding. Counts I and II of the indictment charge that the defendant

knowingly and willfully answered falsely to certain questions posed during a hearing before the bankruptcy court, and that these unsworn statements constitute a violation of 18 U.S.C. § 1001. Count III of the indictment alleges that the defendant knowingly filed a false pleading in a bankruptcy petition in violation of 18 U.S.C. § 152.

Now pending before the Court is the defendant's motion to dismiss Counts I and II of the indictment. The defendant contends that his simple negative responses to the bankruptcy judge's inquiry are not punishable, but rather fall under the so called "exculpatory no" exception to prosecutions under § 1001. Although this doctrine has gained wide use among the federal appellate courts, its validity has never been squarely addressed by the Eighth Circuit. Thus, while the "exculpatory no" argument raised by the defendant is not novel, it does raise issues in this Court for which there are no controlling cases within this circuit. After a thorough review of the law in this area, and for the reasons set forth below, the Court concludes that the motion to dismiss Counts I and II should be granted.

### Background

The offense alleged by the government, arose out of Mr. Taylor's involvement in a bankruptcy proceeding initiated by his estranged wife, Magalene Taylor. On or about September 28, 1988, Ms. Taylor filed a petition for bankruptcy in the Eastern District of Arkansas. *In re Taylor*, No. LR–B–88–1938S. At some point, the defendant intervened and became a party to the petition. At the time the petition was filed, Ms. Taylor was represented by an attorney named Mr. Marquis Jones, of the Jones & Tiller Law Firm, who was also an employer of the defendant.

On November 23, 1988 a motion signed "Magalene Harris Taylor, Pro Se" was filed seeking *inter alia* an extension of time in which to file monthly budget schedules, to disallow the claim of a creditor, to secure new counsel and to disqualify the bankruptcy judge on the grounds of bias. (See Defendant's Exhibit A). On January 11, 1989 a second pleading was filed entitled "RENEWAL OF DEBTOR'S MO-

TIONS, MOTION TO STRIKE CREDITOR'S RESPONSE, OR VOLUNTARY DISMISSAL OF DEBTOR'S CHAPTER 13 CASE". This pleading was signed: "Magalene H. Taylor". (Defendant's Exhibit B).

On January 23, 1989 a document entitled "Affidavit of Magalene Taylor" was filed. The affidavit states that the defendant became involved in her bankruptcy case through his association with her attorney's law firm, and alleges that "Felix was upset over my bankruptcy and did not want it filed." The affiant further stated that she was "not given proper assistance or timely hearing notice by Attorney Jones as a result of Felix interfering." The affidavit does not specify the nature of the alleged interference, but concludes by stating that as a result of the defendant's association with the Jones & Tiller firm, "a conflict of interest existed, and my petition was not properly handled."

Finally, on February 9, 1989, a third motion was filed under the caption: "RENEWED MOTION FOR RECONSIDERATION; MOTION TO STAY ORDER AND SUPPLEMENT THE RECORD; AND REPLY TO DEFENDANT'S RESPONSE TO MOTION FOR RECONSIDERATION". This last motion, which was also signed "Magalene H. Taylor", again alleged that she had been improperly represented by her attorney, and that a conflict had arisen due to her attorney's employment of Felix Taylor. In an accompanying affidavit, Ms. Taylor stated that several documents in the court file were not executed by her or filed with her knowledge or consent. (Defendant's Exhibit C).

In an effort to resolve the conflicts raised by these pleadings, the Bankruptcy Judge, the Hon. Mary Scott, conducted a hearing on February 16, 1989. Present at the hearing were Ms. Taylor, her attorney, Mr. Jones, and the defendant, Felix Taylor. At that hearing, both Ms. Taylor and Mr. Jones denied knowledge of the November 23rd and January 11th pleadings which purported to contain Ms. Taylor's signature. The following dialogue then took place between the Court and the defendant:

Judge Scott: Mrs. Taylor do you know who prepared this, a motion to reinstate the Chapter 13 case? It's dated November 23rd, 1988. Do you know who prepared this pleading? Do you know anything about this pleading? Are you Mr. Taylor?

Felix Taylor: Yes, I am.

Judge Scott: You filed a motion to intervene in this proceeding too, do you know who filed this pleading and signed this pleading?

F. Taylor: I don't have any idea what pleading you are referring to, your honor.

Judge Scott: All right, would you come to the bench and take a look at this pleading and this signature?

F. Taylor: This signature here?

Judge Scott: Un-hun.

F. Taylor: This pleading here, the 23rd of November?

Judge Scott: Un-hun.

F. Taylor: I, uh, was not aware that, that, uh, Chapter 13, this petition was at issue. I did not even get notice of this hearing.

Judge Scott: Then why are you here?

F. Taylor: Because I talked with Mr. Jones and he told me that I needed to be here.

Judge Scott: Well I'm asking you a question now. You've looked at this. Do you know who filed this and signed this? Mrs. Taylor ...

F. Taylor: Pardon me.

Judge Scott: ... said she did not file this and sign this pleading.

F. Taylor: Pardon.

Judge Scott: Mrs. Taylor said that she did not file this pleading or sign it. Do you know who filed it or signed it?

F. Taylor: I'm not aware of the pleading.

It is this last statement which serves as the basis for Count I of the indictment. Specifically, the government alleges that the defendant was in fact the person who signed and filed the November 23rd pleading, and that defendant's denial before the Bankruptcy Court constituted a violation of 18 U.S.C. § 1001.

The Court then turned its focus to the motion filed on January 11, 1989. After Magalene Taylor denied having signed or filed that pleading, Judge Scott recalled the defendant to the bench.

Judge Scott: Have you seen this pleading before?

F. Taylor: Yes, I have seen it before.

Judge Scott: Do you know who signed that pleading?

F. Taylor: No ma'am, I don't.

The government alleges in Count II of the indictment that Mr. Taylor was the author of the January 11th pleading, and that his negative response to the judge's inquiry also constituted a false statement on a matter within the jurisdiction of a department of the government in violation of 18 U.S.C. § 1001.

## Motion To Dismiss

■ In support of the motion to dismiss Counts I and II, the defendant argues that his responses to the Bankruptcy Court's inquiry, even assuming they were false, fall within the so called "exculpatory no" exception to 18 U.S.C. § 1001. The "exculpatory no" doctrine provides a defense to prosecution under § 1001 for an individual who merely supplied a negative and exculpatory response to an investigator's questions. *United States v. Longbehn*, 850 F.2d 450, 452 n. 2 (8th Cir.1988).

In essence, the defendant argues that once he was called upon by Judge Scott to state whether he signed the pleadings, the defendant was faced with two choices: either he could answer in the affirmative and incriminate himself by admitting he filed a false pleading in a bankruptcy petition, which constitutes a separate offense under 18 U.S.C. § 152 and is the basis for Count III of the indictment; or the defendant could provide exculpatory, perhaps untruthful, responses to the judge's inquiry. Section 1001, the defendant argues, was not intended to apply to such "forced" violations.

The notion of an "exculpatory no" is a judicially-created exception to the use of § 1001. It has evolved out of concerns for a defendant's privilege against self-incrimi-

nation as well as the possible abuse of the statute due to its extremely broad language. Title 18, Section 1001 provides:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years or both.

The predecessor statute punished false statements only when made "for the purpose and with the intent of cheating and swindling or defrauding the Government of the United States." *United States v. Rodgers*, 466 U.S. 475, 478, 104 S.Ct. 1942, 1945, 80 L.Ed.2d 492 (1984), *quoting*, Act of Oct. 23, 1918, ch. 194, 40 Stat. 1015. In 1934, at the urging of a number of newly created regulatory agencies, the statute was amended and broadened into its present form thereby eliminating the restriction of its application to only those cases where the government suffered some pecuniary or property loss. *Id. See also Paternostro v. United States*, 311 F.2d 298, 302 (5th Cir.1962). The Supreme Court has interpreted the amended statute as indicating "congressional intent to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." *United States v. Gilliland*, 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941).

The Court has also held that the provisions of the statute are to be liberally interpreted. Thus, for instance, it has rejected giving the word "jurisdiction" any narrow or technical meaning within the context of the statute, and held that a "statutory basis for an agency's request for information provides jurisdiction enough to punish fraudulent statements under § 1001." *Bryson v. United States*, 396 U.S. 64, 70–71, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969). *See also Rodgers, supra*, 466 U.S. at 480–

82, 104 S.Ct. at 1946–48 (investigation into claims of kidnapping and assassination plot within the "jurisdiction" of the FBI and Secret Service even though claims were false and accusations arose out of domestic dispute between defendant and his wife.) The Supreme Court has also held that the "development, scope and purpose of the section shows that 'department', as used in this context, was meant to describe the executive, legislative and judicial branches of the Government." *United States v. Bramblett*, 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955).

▪ The bankruptcy court is empowered to deny a discharge if the debtor engages in certain knowing and fraudulent conduct in connection with a bankruptcy petition. 11 U.S.C. § 727(a). Furthermore, the court is required to report to the United States attorney any information which may form a reasonable belief that a violation of the "laws of the United States relating to insolvent debtors, receiverships or reorganizations has been committed...." 18 U.S.C. § ,3057(a). Clearly then, there was a statutory basis for the court's inquiry in the present case. And the fact that the charges arise out of unsworn statements made during a hearing before the bankruptcy court rather than to an executive agency, does not necessarily prevent the application of § 1001 to false statements during such a proceeding.

▪ The question remains whether the statements for which the government seeks to punish the defendant constitutes a violation of § 1001, or whether they should be excepted under the "exculpatory no" doctrine.

The government, relying solely on *United States v. Morris*, 741 F.2d 188 (8th Cir.1984), contends that the "exculpatory no" doctrine has never been adopted by the Eighth Circuit, and thus prevents this Court from dismissing the Counts I and II on this basis.

In *Morris*, an IRS agent interviewed the defendant in an attempt to determine whether assets were available to a corporation from which unpaid federal taxes could

be recovered. The defendant, the corporation's principal officer, answered there were no such assets. However, it was later learned that the corporation did in fact own real property and the defendant was subsequently convicted of having made a false statement in a matter within the jurisdiction of the IRS in violation § 1001. *Id.* 741 F.2d at 190. On appeal, the defendant argued that his answer "none" in response to the agent's inquiry into the corporation's assets fell within the "exculpatory no" exception.

The *Morris* court rejected this argument on the facts of the case. The court of appeals first noted that the Secretary of Treasury was authorized to collect taxes and administer and enforce the internal revenue laws, and that "a false statement in the circumstances of this case would impair the integrity of an official inquiry * * *, and pervert an authorized function of a government agency." *Id.* at 190–91. While acknowledging that other circuits had held that an exculpatory response made by a person under criminal investigation is not a crime under § 1001, the Eighth Circuit ruled:

> Even if this exception were a part of the case law of our circuit, though, we would not apply it where, as here, the response impeded an essential agency function, the question posed was merely a routine administrative inquiry, and a truthful answer would not have involved possible self-incrimination.

*Id.* at 191 (citations omitted).

The court concluded that because at the time of the agent's inquiry, the defendant was not the target of a criminal investigation, and was never placed in the situation of having to choose between giving a false negative answer and incriminating himself by stating the truth, his answer was punishable under § 1001. The court, however, did not reject the possible application of the so called "exculpatory no" exception under different circumstances.

Similarly, in *United States v. Longbehn, supra,* the defendant argued that false statements given to the FBI during a custodial interrogation could not be used as the basis for a conviction under 18 U.S.C. § 1001. Because the court reversed the conviction on the grounds that the defendant should have been given *Miranda* warnings before he was questioned by agents, it declined to rule on the defendant's contention that his statements fell within the "exculpatory no" exception. *Id.,* 850 F.2d at 452 n. 2.

Thus, the Eighth Circuit has never decided whether it will adopt the "exculpatory no" exception to prosecutions such as this one under § 1001. And neither *Morris* nor *Longbehn* can be read as preventing the Court from reaching the merits of the defendant's motion.

One of the earliest statements of the rationale behind the "exculpatory no" doctrine appears in *Paternostro v. United States, supra,* 311 F.2d 298. In that case, the defendant was a target of an IRS investigation into the receipt of "graft" money distributed to the New Orleans police department. During the investigation, an IRS agent administered an oath to the defendant and then propounded a series of questions concerning the alleged illicit income. The answers of the defendant were all "no" or essentially negative and it was later determined these answers were false. The defendant was subsequently tried and convicted of knowingly making false statements in connection with a matter within the jurisdiction of the IRS in violation of § 1001.

On appeal, after tracing the history leading to the amendment of the statute from false statements involving some pecuniary loss to the government to its present more general language, the Fifth Circuit agreed with the appellant's contention that the purpose of § 1001 was to protect the government from false statements made voluntarily by persons, "and to protect the Government from being the victim of some positive statement which has the tendency and effect of perverting normal and proper governmental activities and functions." *Id.* 311 F.2d at 302.

However, the court held that a conviction under § 1001 could not be sustained where the defendant had merely provided nega-

tive responses to a government investigator's questions. Such a construction, the court reasoned, would go beyond the purpose of the amended statute, while at the same time placing individuals in the position of either waiving their privilege against self-incrimination or providing a false answer—not for the purpose of impeding the functions of a government agency—but rather to exculpate themselves. Noting that such a construction would subject persons to greater penalties than those imposed under the federal perjury statute, even though § 1001 did not require that the statements be made under oath, the court concluded that Congress could not have intended such a result. *Id.* at 302–03.

> The appellant in the case at bar made no statement relating to any claim on his behalf against the United States or any agency thereof; he was not seeking to obtain or retain any official position or employment in any agency or department of the Federal Government; and he did not aggressively and deliberately initiate any positive or affirmative statement calculated to pervert the legitimate functions of Government.

*Id.* at 305.

Since *Paternostro* the continued vitality of the "exculpatory no" exception to § 1001 prosecutions has been accepted by numerous courts of appeal. *United States v. Medina De Perez*, 799 F.2d 540 (9th Cir.1986); *United States v. Rowland*, 789 F.2d 1169 (5th Cir.1986); *United States v. Tabor*, 788 F.2d 714 (11th Cir.1986); *United States v. Cole*, 622 F.2d 98 (4th Cir. 1980), *cert. denied*, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 221 (1981); *United States v. Abrahams*, 604 F.2d 386 (5th Cir.1979); *United States v. Chevoor*, 526 F.2d 178 (1st Cir.), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976).

Both the Second and Seventh Circuits, while not squarely adopting or rejecting the "exculpatory no" doctrine, have indicated that the exception should be construed narrowly and not applied to any statement that goes beyond a simple "no" or similar exculpatory denial. *United States v. King*, 613 F.2d 670, 674 (7th Cir. 1980). *United States v. Capo*, 791 F.2d 1054, 1069 (2d Cir.1986). Both these cases involved defendants, who in response to questions posed by government agents, provided affirmative misrepresentations of fact aimed at impeding an ongoing investigation rather than simple negative answers.

The *Capo* case provides a good illustration of the difference between exculpatory denials and misrepresentations. In that case, the defendant was one of several suspects in a federal investigation of an extortion scheme. During the investigation, an FBI agent asked the defendant to explain certain checks he had received from one of the victims of the scheme. Rather than merely stating that he could not explain them, the defendant told the agent the checks were payment for his winnings in a Super Bowl pool which he claimed the victim ran. *Id.* 791 F.2d at 1060. When the agent pointed out that the checks predated the Super Bowl, the defendant replied, "Well, maybe she knew I was going to win." *Id.* The Second Circuit concluded that even if it were to adopt the "exculpatory no" exception to § 1001, these statements went beyond mere negative responses to the agent's questions, and were instead willful misrepresentations of fact. As such, the court held, the statements fell outside the exception. *Id.* at 1069.

Applying this principle of narrow construction to the present case, it cannot be said that the defendant's statements, for which he has been indicted, go beyond simple, exculpatory denials. In response to the bankruptcy judge's question regarding the authorship of the November 23rd pleading, the defendant said: "I am not aware of that pleading." Similarly, when Judge Scott asked the defendant whether he knew who signed the motion filed on January 11th, Mr. Taylor responded: "No ma'am, I don't." These statements were the equivalent of saying "no", and were not attempts to assert additional facts that might have impeded the court's efforts to resolve the issues raised by the motions.

Decisions within the Ninth Circuit and Fifth Circuit have both reaffirmed the continued vitality of "exculpatory no" exception, and have developed certain criteria for its application.

In *United States v. Bedore*, 455 F.2d 1109 (9th Cir.1972), it was held that falsely identifying oneself to an agent who is attempting to serve a subpoena did not fall within the the scope of § 1001. As in *Paternostro, supra*, the court reasoned:

> The statute was not intended to embrace oral unsworn statements, unrelated to any claim of the declarant to a privilege from the United States or a claim against the United States, given in response to inquiries initiated by a federal agency or department, except, perhaps where such a statement will substantially impair the basic functions entrusted by law to that agency.

*Bedore*, 455 F.2d at 1111.

Consequently, the *Bedore* court developed a three-part test to determine whether the "exculpatory no" exception applies. The court stated that in order to fall within the exception to § 1001, (1) the false statement must be unrelated to a claim to a privilege or a claim against the government; (2) the declarant must be responding to inquiries initiated by a federal agency or department and (3) the false statement must not "impair the basic functions entrusted by law" to the agency. *Id.*

In *United States v. Bush*, 503 F.2d 813 (5th Cir.1974), the court held that the "exculpatory no" exception could not be applied where the government inquiry arose out of a "routine exercise of administrative responsibility" rather than some investigation into possible wrongdoing, and where a truthful answer would not have incriminated the declarant. *Id.* at 815. *Accord, United States v. Medina De Perez, supra*, 799 F.2d at 544. It should be noted that it was the defendant's failure to satisfy these criteria in *United States v. Morris, supra*, which led the Eighth Circuit to decline to rule definitively on the "exculpatory no" doctrine.

In *Bush* the court referred to the exculpatory no doctrine as an "investigative ex-

ception" which rendered § 1001 "inapplicable to statements made to government agents acting in a purely police capacity." *Id.* 503 F.2d at 815. Consequently, the court stated it could not be used as a defense to false statements that prevented or impaired the administration of federal programs and departments. *Id.*

> Although the lines between "administration" and "investigation" cannot be sharply drawn, the argument has been made that this statute was intended to apply only to federal government "administration" and not intended to compel citizens to answer truthfully every question put to them in the course of a federal police criminal investigation. * * * Otherwise, ... the statute with its harsh maximum penalties would give powerful impetus to inquisition as a method of criminal investigation. The exact scope of this possible "investigative" exception to 18 U.S.C. § 1001 ... would in any event turn upon the peculiar facts of a given case.

*Id.* (citations omitted).

The distinction drawn in the *Bush* case is perhaps more commonly applied to cases involving statements made to an executive agency's inquiry. However, because § 1001 has been held to apply to judicial branches of the government as well, *United States v. Bramblett, supra*, a number of cases dealing with the applicability of the "exculpatory no" exception to statements made during judicial proceedings have focused on whether the false statements were made in the context of purely "administrative or housekeeping functions," rather than the "judicial machinery of the Court" in which the exculpatory declaration was prompted out of a desire to avoid possible sanctions. *See e.g., Morgan v. United States*, 114 U.S.App.D.C. 13, 309 F.2d 234 (1962) (failure to truthfully provide information regarding eligibility to practice before the district court involved a purely administrative function of the court, and thus false statements are punishable under § 1001); *C.f., United States v. Abrahams*, 604 F.2d 386 (5th Cir.1979) (bail removal hearing before a magistrate consti-

tuted a "judicial proceeding" rather than mere "administrative" function of the court, and declarant's false negative responses to magistrate's inquiry not within the scope of § 1001). *United States v. Erhardt*, 381 F.2d 173 (6th Cir.1967) (introduction of false documents as evidence in criminal proceeding beyond the scope of § 1001).

While these cases do not amount to an exhaustive discussion of the scope of the "exculpatory no" doctrine, they do provide certain guiding principles applicable to the case at bar. As noted above, Mr. Taylor's responses to Judge Scott's inquiry did not go beyond simple exculpatory denials. In addition, the statements themselves did not seek to win some claim or privilege through the exercise of the bankruptcy court's judicial powers. Assuming the defendant's responses to Judge Scott's investigative inquiries were false, they amounted to no more than an attempt to exculpate himself, rather than to obtain some favorable ruling in the case.

A different conclusion might be required if Counts I and II alleged that the motions filed on November 23rd and January 11th constituted the violation of § 1001. In such a case, assuming the government could prove the defendant authored and forged Ms. Taylor's signature on these documents, the effect of the statements would have been to seek a ruling from the court on the basis of false information. Clearly such a result would amount to a "perversion" of the normal functioning of the court.

It is also clear that the defendant did not make his statements voluntarily, but rather in response to investigative questions posed by the court. Moreover, this questioning cannot be characterized as falling within the "housekeeping" or "administrative" functions of the court. At the start of the hearing, the court noted it was faced with serious allegations of "forgery" which had to be resolved prior to disposing of the motions. The court also noted its duty to report suspected violations of the law to the United States attorney.

It is also evident that at least with respect to the questioning of the defendant, the court assumed an investigatory role in trying to determine whether Mr. Taylor had authored the allegedly fraudulent motions. After the defendant denied filing or signing either of the two allegedly false motions, Judge Scott showed Mr. Taylor a copy of a pleading which contained his own signature. She then asked him to compare his own signature with that on the allegedly false motions.

Judge Scott: Do you think those signatures look at all alike?

F. Taylor: ... have no idea. I am.

Judge Scott: (Unintelligible). Mr. Taylor I'm asking you specifically did you sign your wife's name on this pleading?

F. Taylor: On which pleading are you referring to?

Judge Scott: The Renewed Motion. From (unintelligible).

\* \* \* \* \* \*

F. Taylor: ... if you're asking me why, I think I need an attorney.

Judge Scott: I'm not asking you that, I'm asking you ...

F. Taylor: No, I'm saying ...

Judge Scott: ... I'm asking you if you signed that ...

F. Taylor: ... before I answer any questions and if I'm going to be on trial, I want an attorney, then, ... understand that?

Judge Scott: Oh, yes, I understand you. I'm trying to respond to Mrs. Taylor's motion ...

\* \* \* \* \* \*

F. Taylor: ... I'm not aware of Mrs. Tation, Mrs. Taylor's motion.

Judge Scott: All right then, that's all we needed to know.

At this point in the hearing Mr. Taylor had already stated he was not aware of the pleading. The other parties present similarly denied knowledge of the motions. Thus, the additional inquiry of Mr. Taylor, and the presentation of other samples of his handwriting which the judge believed were similar to those on the forgery, can

only be characterized as investigative. Clearly, the defendant believed he was being interrogated as is evidenced by his request to consult with an attorney before answering any further questions.

Having been called to the bench and required to answer the court's questions, the defendant faced the choice of either denying or admitting authorship. The former, while exculpatory, may have been false. But the latter choice, would have incriminated the defendant in the commission of another offense. The dilemma posed by this set of "Hobson" choices is reinforced by the fact that the defendant has also been charged in Count III of the indictment with filing a false statement in connection with a bankruptcy petition in violation 18 U.S.C. § 152. Therefore, application of the "exculpatory no" exception here would not contradict the limitations articulated by the Eighth Circuit in *United States v. Morris, supra*.

Finally, there is no assertion, nor is it plainly evident, that the false statements themselves substantially impaired the functioning of the court. Again a different result might be required if Counts I and II were based on the filing of the motions. But that is not the charge which the defendant faces. Given the unique circumstances of this case, the Court concludes that the allegedly false statements for which the defendant has been indicted cannot serve as a basis for a conviction under 18 U.S.C. § 1001.

IT IS, THEREFORE ORDERED that the defendant's motion to dismiss Counts I and II of the indictment be, and it is hereby, granted.