

ingsworth & Beshears, P.A., David D. Dodge, Mark R. Lieberman, Eaton, Lazarus, Dodge & Lowrey, Ltd., Phoenix, Ariz., for plaintiff-appellee.

Dougal B. Reeves, Jr., Gregg Clarke Gibbons, Simon, Reeves & Roberts, Scottsdale, Ariz., for defendants-appellants.

Before WALLACE, KENNEDY, and FARRIS, Circuit Judges.

## ORDER

Footnote 1 on page 7 of the opinion filed June 2, 1986, is hereby deleted.

The petition for rehearing is denied.

Pat Swan, Asst. U.S. Atty., argued, Peter K. Nunez, U.S. Atty., Pat Swan, Asst. U.S. Atty., on the brief, San Diego, Cal., for plaintiff-appellee.

Cynthia G. Aaron, Asst. Federal Public Defender, San Diego, Cal., for defendant-appellant.

Before FLETCHER, FERGUSON and NELSON, Circuit Judges.

FLETCHER, Circuit Judge:

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Soledad MEDINA DE PEREZ, Defendant-Appellant.**

No. 85–5121.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 4, 1986.

Decided Sept. 10, 1986.

Soledad Medina de Perez appeals her conviction of two counts of making false statements to a federal officer, in violation of 18 U.S.C. § 1001. Perez contends that her responses to questions posed by federal agents during a post-arrest interrogation are not within the reach of the statute, and alternatively, that her statements, taken as a whole, are not material within the meaning of section 1001. We agree that section 1001 does not apply to a criminal defendant's responses to investigative officers during a post-arrest interrogation, and therefore, we reverse.

## I. FACTS

In January 1985, Perez drove a pickup truck with a camper shell into the primary inspection lane at the Port of Entry in San Ysidro, California. Perez's two children and her sister Erlinda Zavalza were passengers in the truck. As she entered the inspection lane, Customs Inspector Grasska

noticed signs that someone had tampered with the camper shell.

Grasska then asked Perez standard questions about her citizenship. Perez declared that she was a Mexican citizen and offered the inspector her resident alien card, proving that she resided legally in the United States. Grasska then asked Perez and her passengers about any items they were bringing into the United States from Mexico. Perez told him that they had purchased two pairs of shoes, a pinata, and some Mexican candy.

The inspector asked additional questions concerning the ownership of the truck, the reason for the trip to Mexico, and Perez's employment. Perez answered that she had borrowed the truck from a friend in El Monte, California; that she was unemployed; and that the purpose of the trip was to shop for bargains in Tijuana, although they quickly had run out of money before purchasing many items.

Because Inspector Grasska thought Perez's answers suspicious, and because of the apparent tampering with the camper shell, he directed Perez to the secondary inspection area. Grasska searched Perez's purse and found $55. He then pried open the interior ceiling of the camper shell, and discovered individually wrapped packages, the contents of which he tested and which proved to be marijuana. The inspector arrested Perez, and placed her in a detaining cell.

Agent Tierney of the Drug Enforcement Administration (DEA) and Agent Baez of U.S. Customs advised Perez of her *Miranda* rights, and asked her if she would like to tell them about the truck. Perez said that she would. When the agents asked Perez about how the truck came into her possession, initially she claimed that her sister, Erlinda, had borrowed the truck from a person named Carmen Mendoza and that they had driven it to Tijuana to shop. Perez denied knowing about the marijuana hidden in the camper shell.

Agent Tierney left to speak with Erlinda, and when he returned to resume the interview with Perez approximately ten minutes later, she repeated the same version of her story. However, when Agent Tierney was leaving the second time, Perez requested him to return, and she admitted that previously she had not been truthful. She told Agent Tierney that a man named Jose, whose last name she did not know, had asked her to pick up his truck in Mexico and drive it across the border into the United States. She claimed that she had met Jose in a bar. Jose had offered to pay her "a decent amount" of money to drive the truck across. He told Perez that he could not do so because he was an illegal alien.

Perez explained to Agent Tierney that Jose had driven Perez, her two children, and sister to the border, and had arranged for a taxi driver to take them to downtown Tijuana, where the truck was parked. They located the truck, shopped, ate, and drove the truck back to the Port of Entry. She still denied having any knowledge of the marijuana. Perez's second version of events was apparently much closer to the truth.[1]

Perez was indicted on two counts, for importation of marijuana, in violation of 21 U.S.C. §§ 952, 960, and 963, and possession of marijuana, in violation of 21 U.S.C. § 841(a)(1). The prosecutor then filed a

1. Undisputed testimony at trial established that Juan Zavalza, Erlinda's estranged husband, bought the truck. At his request, Carmen Mendoza, who lived next to Juan's brother Jose, signed the car registration papers. Mendoza and Juan's sister, Josefina, drove the truck to the Zavalza home in Talpa, Mexico, near Guadalajara. Mendoza testified that Jose told her that they planned to fill the truck with marijuana. He offered her $5,000 to drive the marijuana-laden truck into the United States. She testified that she refused. The jury believed Perez's testimony that Jose Zavalza then called Erlinda to ask for help driving the truck across the border; that Perez agreed to help because of Jose's immigration status and because he offered to pay her to do so; that she was an innocent victim of Juan and Jose Zavalza's smuggling operation; that Jose had driven them to the border as she described to Agent Tierney; and that Perez had no knowledge of the truck's illegal cargo. Perez testified during trial that she did not tell the officers the truth following her arrest because she was frightened.

superseding four count indictment, charging the two original offenses, and adding two counts of making false statements to a federal officer, in violation of 18 U.S.C. § 1001.

Count three charged Perez with falsely stating to Agent Tierney that she drove the pickup truck to Mexico from the United States. Count four related to Perez's statement that Erlinda had borrowed the truck from Carmen Mendoza.

At trial, the jury acquitted Perez on the marijuana importation and possession offenses, but convicted her on the false statement charges. Perez's motion for a judgment of acquittal pursuant to Fed.R. Crim.P. 29(c) was denied. Perez timely appeals the district court's judgment.

## II. DISCUSSION

18 U.S.C. § 1001 provides in part:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes any false, fictitious or fraudulent statements or representations, ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Although this case requires that we interpret section 1001 in a new context—a post-arrest interrogation by DEA agents—we find that precedent and legislative history compel the conclusion that this statute was never intended to embrace statements made by persons in Perez's circumstances.

Courts interpreting section 1001's sweeping language have turned to legislative history for guidance. As discussed in *United States v. Gilliland*, 312 U.S. 86, 91–92, 61 S.Ct. 518, 521, 85 L.Ed. 598 (1941) and as recapitulated in subsequent cases, prior to amendment in 1934 the false statement portion of section 1001's predecessor statute[2] penalized anyone who:

"for the purpose of obtaining or aiding to obtain the payment or approval of [false

claims], or for the purpose and with the intent of cheating and swindling or defrauding the Government of the United States, or any department thereof ... shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or use or cause to be made any false or fraudulent statements or, representations ... [40 Stat. 1015 (1918) ]"

*Id.* at 92, 61 S.Ct. at 521.

The 1934 amendments eliminated the "purpose" clauses, replacing the quoted portion of § 1001 with the following:

"whoever shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations ... in any matter within the jurisdiction of any department or agency of the United States ... [48 Stat. 996]"

*Id.* at 92–93, 61 S.Ct. at 521–22.

Thus, as amended, the statute prohibited not only those false statements that might cause pecuniary or property loss to the government, but also statements and deceptive practices that prevented government agencies from carrying out administrative or regulatory directives, thereby "perverting" their functions. *Id.* at 93, 61 S.Ct. at 522. By including the phrase "in any matter within the jurisdiction," Congress intended a substitution for the deleted language of purpose, making it clear that not *all* false statements were proscribed, but only those related to government entities. *United States v. Yermian*, 468 U.S. 63, 74, 104 S.Ct. 2936, 2942, 82 L.Ed.2d 53 (1984) (citing *United States v. Bramblett*, 348 U.S. 503, 506, 507–08, 75 S.Ct. 504, 507, 99 L.Ed. 594 (1955)).

The impetus for this statutory amendment came from the Secretary of the Interior, who, under the pre–1934 statute, had been unable to enforce effectively provisions of the National Industrial Recovery

---

**2.** The Act of June 18, 1934, ch. 587, § 35, 48 Stat. 996, covered both false claims and false statements. In 1948, the false claims portion became 18 U.S.C. § 287, while the false statement provision was codified as 18 U.S.C. § 1001.

Act of 1933 prohibiting interstate transportation of "hot oil."

The statutory amendment that the Secretary sought would provide him with the means to combat the "hot oil" frauds,[3] and other departments and agencies with a weapon to eliminate similar abuses. *See Bramblett,* 348 U.S. at 507–08, 75 S.Ct. at 507; *Gilliland,* 312 U.S. at 93–95, 61 S.Ct. at 522–523; S.Rep. No. 1202, 73d Cong., 2d Sess. (1934) (amendment was designed to reach "hot oil" cases, and also cases involving contractors on Public Works Administration projects who falsified certificates as to the wages being paid); 78 Cong.Rec. 11270 (1934) ("There is nothing which permits us to make an investigation and prosecute persons who are engaged in the 'kickback' practice. They make false returns, claiming that they paid certain amounts to their employees, when they have not done so. *This bill just amends the law so as to give the Federal Government authority to deal with that class of cases*") (emphasis added).

The Supreme Court has stated that section 1001 should be construed broadly, and protects "myriad governmental activities." *See United States v. Rodgers,* 466 U.S. 475, 480–81, 104 S.Ct. 1942, 1946–47, 80 L.Ed.2d 492 (1984); *Bryson v. United States,* 396 U.S. 64, 70, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969); *Bramblett,* 348 U.S. at 507, 75 S.Ct. at 507. Section 1001 applies when a declarant makes false statements to a legislative entity to gain a monetary benefit, *e.g., Bramblett,* 348 U.S. at 504, 75 S.Ct. at 505 (former congressman violated § 1001 by falsely representing that a person was entitled to compensation as his clerk); gives false information to avoid payments due the government, *e.g., United States v. Knox,* 396 U.S. 77, 78, 90 S.Ct. 363, 364, 24 L.Ed.2d 275 (1969) (declarant made false statements on wagering tax forms); attempts to gain a governmental privilege, *e.g., Pitts v. United States,* 263 F.2d 353, 360 (9th Cir.) (declarant sought Atomic Energy Commission security clearance), *cert. denied,* 360 U.S. 935, 79 S.Ct. 1457, 3 L.Ed.2d 1547 (1959); makes false statements, not realizing that they were made in matters within a federal agency's jurisdiction, *Yermian,* 468 U.S. at 75, 104 S.Ct. at 2943, or fabricates a story that falsely accuses a third party of a crime, thus deliberately wasting agency investigative resources, *see, e.g., Rodgers,* 466 U.S. at 476, 104 S.Ct. at 1944 (declarant falsely stated that his wife had been kidnapped and that she was involved in a plot to assassinate the president); *United States v. Adler,* 380 F.2d 917, 919 (2d Cir.) (false statement that public officials had accepted bribes), *cert. denied,* 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967).

However, when a false statement does not fall within that "class of cases" that Congress conceivably could have intended to reach, courts have declined to apply section 1001, under varying rationales.[4] This court has noted, that the statute, if read

---

3. Petroleum producers were not permitted to ship oil in quantities exceeding amounts permitted under state laws. To ensure compliance, producers were required to file periodic statements with the Secretary, reporting the quantities shipped in interstate commerce. With the revised statute in effect, the Secretary could prosecute those who filed falsified reports.

4. Some courts have reasoned that the defendant's words should not be construed as a "statement" within the meaning of the statute, *see, e.g., Paternostro v. United States,* 311 F.2d 298, 305 (5th Cir.1962); some have held that in a specific context, a matter is not "within the jurisdiction" of the agency, *e.g., United States v. Davey,* 155 F.Supp. 175, 177 (S.D.N.Y.1957), still others have concluded that certain government entities are not "agencies" under the statute,

*Rodgers,* 466 U.S. at 483 n. 4, 104 S.Ct. at 1948 n. 4; *United States v. Allen,* 193 F.Supp. 954, 959 (S.D.Cal.1961) (grand jury is not an agency). *See* Note, *Fairness in Criminal Investigations Under the Federal False Statement Statute,* 77 Colum.L.Rev. 316, 320–25 (1977).

In *Rodgers,* the Supreme Court rejected a narrow construction of the term "jurisdiction" that would exclude the authority to investigate, and include only those agency functions where the agency has power to make binding determinations. 466 U.S. at 489, 104 S.Ct. at 1953. We agree with *Rodgers* that section 1001's terms should be construed broadly; however, we do not believe that the *Rodgers* court meant to imply that no restrictions of any kind on any of section 1001's terms are permissible.

literally, could make "virtually any false statement, sworn or unsworn, written or oral, made to a Government employee ... a felony." *United States v. Bedore*, 455 F.2d 1109, 1110 (9th Cir.1972). *Accord United States v. Thevis*, 469 F.Supp. 490, 513 (D.Conn.), *aff'd*, 614 F.2d 1293 (2d Cir. 1979), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1834, 64 L.Ed.2d 260 (1980).

In *Bedore*, this court addressed whether section 1001 should apply when an individual makes a false statement to an F.B.I. agent in response to that agent's inquiry. F.B.I. agents sought Bedore to serve him with a subpoena. When the agent asked Bedore his name, he replied that he was "Tom Halstead." *Id.* at 1110. This court held that Bedore's statement was not within the scope of section 1001. The court, reasoning from legislative history, stated that:

> [I]t is evident that section 1001 was not intended to reach all false statements made to governmental agencies and departments, but only those false statements that might support fraudulent claims against the Government, or that might pervert or corrupt the authorized functions of those agencies to whom the statements were made.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> The statute was not intended to embrace oral unsworn statements, unrelated to any claim of the declarant to a privilege from the United States or a claim against the United States, given in response to inquiries initiated by a federal agency or department, except, perhaps where such a statement will substantially impair the basic functions entrusted by law to that agency.

*Id.* at 1111.

Thus, in *Bedore*, this court adopted a multi-part test to determine whether a limitation on section 1001 known as the "exculpatory no" doctrine, should apply.

While this court's subsequent decisions have clarified the "exculpatory no" doctrine, they have not eroded it. In *United States v. Rose*, 570 F.2d 1358, 1364 (9th Cir.1978), this court, although declining to invoke the exception when a declarant made false statements to a customs agent to gain the privilege of entry, reaffirmed its approval of the *Bedore* criteria.[5]

The *Rose* court elaborated on *Bedore*'s requirement that the statement be "given in response to inquiries initiated by a federal agency or department." Relying on *United States v. Bush*, 503 F.2d 813, 815–19 (5th Cir.1974), the court injected two new factors: (1) whether the government agency's inquiries constituted a "routine exercise of *administrative* responsibility" and (2) whether a truthful answer would have incriminated the declarant. *Rose*, 570 F.2d at 1364.

*Rose* did not explain what constitutes a "routine exercise of administrative responsibility." However, *Bush*, from which this factor was drawn, does provide some insight into the proper analysis. In *Bush*, the defendant had lied to IRS special agents who had inquired about possible kickbacks that he paid to a taxpayer under investigation. The *Bush* court observed that:

> Section 1001 has usually been held inapplicable to statements made to government agents acting in a purely "police" capacity. (citations omitted). Doubts as to whether false statements made to police agents of the federal government fall within the purview of 18 U.S.C. § 1001 are premised on a potential "investigative" exception to § 1001, based on its historical evolution as a statute seeking to prevent the administration of federal government programs from being subverted or frustrated by the false presentation of interested parties. (citations omitted)
>
> \*　　\*　　\*　　\*　　\*　　\*

---

**5.** *I.e.*, that to fall within the doctrine (1) the false statement must be unrelated to a claim to a privilege or a claim against the government; (2) the declarant must be responding to inquiries initiated by a federal agency or department; and (3) the false statement must not "impair the basic functions entrusted by law" to the agency.

Although the line between "administration" and "investigation" cannot be sharply drawn, the argument has been made that this statute was intended to apply only to federal government "administration" and not intended to compel citizens to answer truthfully every question put to them in the course of a federal police or federal criminal investigation.

*Bush,* 503 F.2d at 815.

Hence, it is when government agents are acting as "police investigators" rather than as "administrators" that this prerequisite for invocation of the "exculpatory no" doctrine is met.[6]

We have since utilized the *Bedore/Rose* test in *United States v. Carrier,* 654 F.2d

559, 561 (9th Cir.1981) (false statements to customs agent punishable), and *United States v. Gonzalez-Mares,* 752 F.2d 1485, 1492 (9th Cir.) (false statements by declarant seeking the privilege of probation are within § 1001's scope), *cert. denied,* —— U.S. ——, 105 S.Ct. 3540, 87 L.Ed.2d 663 (1985).[7]

Applying the "exculpatory no" test in the present case, we conclude that Perez easily satisfies its criteria. First, Perez's false statements about driving the truck to Mexico and borrowing it from Carmen Mendoza were unrelated to a claim to a privilege or a claim against the United States.[8] Second, without doubt, during the post-arrest inter-

---

**6.** *Cf. United States v. Chevoor,* 526 F.2d 178, 183 (1st Cir.1975) ("Cases involving the F.B.I. or U.S. Attorney initiating the questioning have uniformly held the statute not to cover the responses, although not always by the same rationale") (footnotes omitted), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976); *Thevis,* 469 F.Supp. at 513 ("[T]he courts with near unanimity have excluded from the statute's sweeping language unsworn, oral, false exculpatory responses to questions posed by investigative agents"); *United States v. Ehrlichman,* 379 F.Supp. 291, 292 (D.D.C.1974) (stating that courts have been "troubled by the application of § 1001 to F.B.I. interviews"); *United States v. Goldfine,* 538 F.2d 815, 828 (9th Cir.1976) (Wright, J., specially concurring) (In a case in which DEA agents questioned a pharmacist concerning illegal drug purchases, the court held that *Bedore* and the "exculpatory no" exception did not apply; the majority's holding rested on the conclusion that the DEA agents were not conducting a criminal investigation at the time questions were asked, but an administrative determination into the declarant's qualifications for the "privilege" of dispensing drugs). *But cf. United States v. Mitchell,* 397 F.Supp. 166, 174 (D.D.C.1974) (concluding that a criminal defendant's false statements to F.B.I. agents are within the scope of § 1001).

We note that courts have been divided on the question whether section 1001 applies during Internal Revenue investigations. *Compare United States v. Ratner,* 464 F.2d 101, 105 (9th Cir. 1972) ("[The] Ninth Circuit cases hold[ ] answers to Internal Revenue Service investigations to be outside the 'exculpatory—"no"—police-officer's holdings"); *Neely v. United States,* 300 F.2d 67, 69 (9th Cir.) (altered lease given to I.R.S. agent), *cert. denied,* 369 U.S. 864, 82 S.Ct. 1030, 8 L.Ed.2d 84 (1962), *and Cooper v. United States,* 282 F.2d 527, 530 (9th Cir.1960) (declarant gave false responses when asked whether he had received income from prostitution) *with*

*Paternostro v. United States,* 311 F.2d 298, 300–01 (5th Cir.1962) (police officer lied to IRS about accepting graft money). Courts that have refused to apply the doctrine to tax fraud investigations may have been influenced by legislative history. *See Chevoor,* 526 F.2d at 183 n. 9 ("Tax Fraud investigations would appear to be closer to what the statute was intended to cover than are FBI investigations, because underlying any tax inquiry is the question of monetary loss to the government).

**7.** The government argues that *Gonzalez-Mares* and *United States v. Moore,* 638 F.2d 1171, 1176 (9th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981) have "seriously eroded" *Bedore.* We have studied these cases carefully and find no support for this conclusory statement. *Gonzalez-Mares* applied the test developed in *Bedore* and *Rose,* and simply found the criteria for invocation of the exception were not met. Although *Gonzalez-Mares* does cite dicta in *Moore* that questions whether the "exculpatory no defense has any validity within this circuit," *Gonzalez-Mares* then cites *Bedore* for the proposition that the doctrine has been recognized in "limited circumstances." *Gonzalez-Mares,* 752 F.2d at 1492.

**8.** The government argues that Perez was claiming the privilege of entry to the United States. However, not all statements that a declarant makes to a government employee who is located at a border are "related" to the privilege of entry. Thus, while we would find merit in the government's argument if a declarant lied about her citizenship in order to secure entry, the government's contention is unpersuasive in Perez's case. The agents were interrogating Perez after arrest, to ascertain her possible connection to a drug smuggling ring; they were not determining whether she satisfied the various prerequisites for entry.

rogation, agent Tierney was acting as a police investigator and not as a program administrator, and therefore his inquiries could not constitute a "routine exercise of administrative responsibility." We also think it obvious that truthful answers would have been potentially incriminating at trial on the marijuana charges.[9] The jury in this case believed Perez's testimony that she was unaware of the marijuana hidden in the camper shell. However, the admission that Perez picked up the truck in Tijuana, on Jose's instruction, and drove it across the border in exchange for money was probative of her knowledge of the true reason for the trip. The jury rationally could have concluded—although it did not—that these facts tended to prove guilt.

Finally, Perez's statements did not impair the DEA's functions. The *Bedore* court adopted this criterion, cognizant of section 1001's legislative history and Congress's concern over statements that pervert or corrupt agency operations. Bedore lied to the FBI agent who wanted to serve him with a subpoena. The *Bedore* court implicitly held that this false statement, given in response to inquiries by government investigative agents in an interview that the defendant did not initiate, was not the type of statement that perverts an investigative agency's functions.

We agree with *Bedore*'s holding and conclude that Perez's case presents an even stronger case for applicability of the exception. In a post-arrest criminal investigative setting, a competent government investigator will anticipate that the defendant will make exculpatory statements. A defendant who meets this expectation cannot possibly pervert the investigator's police function. We presume that a thorough agent would continue vigorous investigation of all leads until he personally is satisfied that he has obtained the truth. *See United States v. Lambert*, 501 F.2d 943, 946 (5th Cir. 1974) (en banc) (exculpatory denial by a person under investigation may have less potential for misleading the Bureau and perverting its function than a discursive voluntary statement suggesting that a third person is guilty of crime); *Thevis*, 469 F.Supp. at 513–14 (discussing congressional intent to protect agencies from perversion and concluding that the declarant's lies to FBI agents about her relationship with a suspected check-kiter were not within the scope of the statute). *Cf. United States v. Nezowy*, 553 F.Supp. 773, 777 (E.D.Pa.1982) (distinguishing criminal investigations from falsified asylum applications; in the latter case, "truth was ... the essence" of the procedure) *aff'd*, 723 F.2d 1120 (3d Cir. 1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984).

Hence, we hold that Perez's statements are not within the scope of section 1001.[10]

---

**9.** We note that courts have differed regarding whether the defendant must limit the exculpatory response to a .simple "no", or instead, may speak other exculpatory words. *Compare Bedore*, 455 F.2d at 1110 (Bedore, in response, affirmatively asserted that he was someone else); *United States v. Tabor*, 788 F.2d 714, 718 (11th Cir.1986) (defendant "did no more than disclaim involvement in possible criminal activity"); *Bush*, 503 F.2d at 816–18 (defendant completed false two-page affidavit; court states that the "essence" of his statement was an "exculpatory 'no'"); *Thevis*, 469 F.Supp. at 498 (declarant first falsely stated that she was alone and not with the suspect inside the bank and denied she knew him; she then stated that she met him for a "fling"; she then changed her story again and said that the suspect was her husband and she falsely identified him); *and United States v. Davey*, 155 F.Supp. 175, 177 (S.D.N.Y.1957) (not focusing on defendant's exact verbiage) *with United States v. Capo*, 791 F.2d 1054, 1069 (2d Cir.1986) (suspect's fabrication to FBI agents was more than a simple "no"; [w]hile this Court has never quite embraced the 'exculpatory no' exception, we have consistently stated that if we did adopt it we would construe it narrowly, ruling that any statement beyond a simple 'no' does not fall within the exception"); *United States v. Duncan*, 693 F.2d 971, 976 (9th Cir. 1982) (the defendant did more than "merely say no ... he offered ... affirmative statements"), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983); *Moore*, 638 F.2d at 1176.

We fail to see, in the context of a post-arrest interrogation, any meaningful distinction between an exculpatory "no, I am not guilty," and a more complete, evasive exculpatory response to a direct question.

**10.** In a recent district court case, similar to the case at bench, the court found section 1001 applicable to a criminal defendant's statements. *United States v. Marusich*, 637 F.Supp. 521 (S.D.

Such a result comports with precedent, with legislative history, and with our deeply ingrained beliefs regarding acceptable treatment of an accused in custody. *See Miller v. Fenton,* — U.S. —, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985) ("[The] court's analysis has consistently been animated by the view that 'ours is an accusatorial and not an inquisitorial system'"); *Lambert,* 501 F.2d at 946 n. 4 (exculpatory no exception is due in part to "latent distaste for an application of the statute that is uncomfortably close to the Fifth Amendment); *Bush,* 503 F.2d at 815 (application of section 1001 to criminal investigations encourages the inquisition as a method of criminal investigation); *Thevis,* 469 F.Supp. at 513 (defendant answering F.B.I. agent's questions could be unaware that he might be prosecuted for a false answer); *United States v. International Business Machines Corp.,* 415 F.Supp. 668, 672 n. 14 (S.D.N.Y.1976) (same).

Because Perez's false statements are not properly within the scope of section 1001, her conviction must be REVERSED. Therefore, we do not reach the issue whether Perez's false statements, which were recanted during the course of the interrogation, were material.

Cal.1986) (available August 15, 1986, on Westlaw, DCT Database).

In *Marusich,* postal inspectors questioned the defendant in connection with the possible mailing of a bomb. Following a jury trial for that offense, the court declared a mistrial because the jury had been unable to return a unanimous verdict. *Id.* at 521. Shortly before retrial, the grand jury returned a superseding indictment, charging the defendant with a § 1001 violation for falsely stating to the inspectors that he had not vandalized the bomb recipient's car. During the first trial, the defendant had admitted he had committed the vandalism.

The court applied the test as developed in *Bedore* and *Rose. Id.* at 525–26. The court reasoned that the defendant's false statement impaired the Postal Service's functioning, because had the defendant told the truth, the inspectors could have focused their investigation on him earlier. The court further concluded that the postal inspector's questioning involved a "routine exercise of administrative responsibility," although it admitted that it did not know what this element of the test meant. *Id.* at 526.

The court also relied on *Rodgers.* In *Rodgers* the declarant falsely accused a third person of a crime, thereby causing a needless investigation ("[I]t is a perversion of [their] authorized functions to turn either [the FBI or secret service] into a Missing Person's Bureau for domestic squabbles"). *Rodgers,* 466 U.S. at 481, 104 S.Ct. at 1947. However, we note that *Bedore* recognized that in such cases, the defendant's conduct would pervert an agency's authorized functions. *Bedore,* 455 F.2d at 1111 ("Typical of the kind of statements that are within the purview of section 1001 are false reports of crime made to federal law enforcement agencies that may engender groundless federal investigations").