Nicolas **GUERRA**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

Nos. CV 86–2405 MRP, CV
86–2667 MRP.

United States District Court,
C.D. California.

Oct. 10, 1986.

Paul L. Gabbert, Santa Monica, Cal., for plaintiff.

Mason C. Lewis, Asst. U.S. Atty., Los Angeles, Cal., for defendant.

## MEMORANDUM AND ORDERS DENYING SUPPRESSION OF EVIDENCE AND SETTING ASIDE TERMINATION ASSESSMENT

PFAELZER, District Judge.

On January 26, 1986, the Los Angeles County Sheriff's Department seized approximately $167,000 from plaintiff Nicolas Guerra ("Guerra"). Since January 30, 1986, this money has been in the hands of the United States government. These suits represent two attempts by Guerra to recover this money. Because this Court holds that Fed.R.Crim.P. 41(e) cannot be asserted against the Internal Revenue Service ("IRS") in a civil tax proceeding, plaintiff's motion for the return and suppression of evidence must be denied. Because this Court holds that the making of the IRS termination assessment against Guerra was unreasonable, and the amount of that assessment was inappropriate, this Court orders that the assessment be set aside, pursuant to 26 U.S.C. § 7429 (1986 Supp.).

## I. FACTS

Angel Leon ("Leon"), the nephew of Guerra, has been the object of an ongoing investigation into cocaine transactions in the Huntington Park area of Los Angeles since January 1985. In January 1986, information received by the Los Angeles County Sheriff's Department led to surveillance of Leon and his associates by the Sheriff's Department. During the surveillance, Guerra was observed on several occasions in the presence of Leon.[1] Twice,

---

1. Angel Leon was apparently the manager of "Super Video," of which Guerra is part owner. Guerra worked in the evenings at Super Video after his daytime job at the Garrett Corporation.

Guerra visited Isidro Videos, in which he had once been a business partner with Isidro Fernandez, one of the suspected members of Leon's cocaine ring. Once, Guerra was seen carrying a package which earlier in the day Fernandez had been seen carrying. Surveillance also revealed that Guerra twice visited convenience stores, and occasionally made calls from pay telephones.[2]

The surveillance of Leon and his associates gave rise to probable cause for the search of a number of people and a number of locations. Accordingly, an affidavit setting forth the results of the surveillance was presented to the Honorable Roosevelt F. Dorn, Judge of the Superior Court of Los Angeles County. Judge Dorn signed a warrant authorizing the search of seven buildings, five people, and four cars. Among the buildings was 3620 W. 132 St. in the City of Hawthorne, the home of Guerra and his wife, Caridad.

On January 28, 1986, at about 4:30 p.m., at least ten Los Angeles County Sheriff's deputies in raid jackets, riding in six vehicles, carrying semi-automatic weapons and accompanied by two police dogs, converged on Guerra's apartment.[3] Once there, they seized all of Caridad Guerra's gold jewelry, two legally registered handguns, and an ounce of white powder which turned out to be neither cocaine nor "cut" used in the street sale of cocaine. They also seized the approximately $167,000 at issue in this case, most of which was hidden in false ceilings in the apartment. Guerra, handcuffed to a chair and surrounded by deputies, originally denied any knowledge of the money, but soon said that it was his savings from his video business.

On January 30, 1986, the Sheriff's Department, apparently realizing that it could not make a successful criminal case against Guerra, turned over the $167,000 to the United States Customs Service ("Customs Service").[4] At the time, the Customs Service intended to institute forfeiture proceedings against Guerra pursuant to 21 U.S.C. § 881(b)(4) (1981 and 1986 Supp.). Soon thereafter, on February 3, 1986, the IRS noticed a termination assessment against Guerra for just under $235,000 in unpaid back taxes, pursuant to 26 U.S.C. § 6851 (1967 and 1986 Supp.).

Guerra promptly took steps to protect his legal position. In March, he exhausted his administrative remedies within the IRS, this being a prerequisite for filing a suit to challenge the assessment. On April 15, 1986, Guerra filed the first of the actions at issue here, CV 86–2405, to contest his IRS assessment, pursuant to 26 U.S.C. § 7429.

The Customs Service continued to hold the money even though it had become clear that it did not have enough evidence to proceed successfully with a forfeiture action against Guerra. On April 28, 1986, Guerra filed the second of these actions, CV 86–2667, which sought the return of the money from the Customs Service pursuant to Fed.R.Crim.P. 41(e). On May 8, the IRS levied on the $167,000, and took possession of it from the Customs Service, pursuant to 26 U.S.C. § 6332 (1967 and 1986 Supp.). At a hearing before this Court on May 19, 1986, the Customs Service conceded that it had held the money illegally, but urged

---

**2.** Guerra denies that most of the above events ever occurred, and demands a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978), to demonstrate that they never happened. Since this Court concludes that the events totally fail to create probable cause for the search of Guerra's apartment, it is not necessary to resolve this conflict in the evidence.

**3.** The deputies also searched Guerra's car, although the search warrant did not authorize such a search. They seem to have found nothing which they considered suspicious there.

**4.** It appears that the Customs Service offers very significant financial incentives for local police authorities to make transfers such as this one. Moreover, under current case law, state agencies must bring forfeiture actions much more promptly than federal government agencies. *Compare* Cal. Health & Safety Code § 11488.2 (West 1986 Supp.) (forfeiture proceedings must be instituted within fifteen days of seizure); *United States v. $8,850*, 461 U.S. 555, 556, 103 S.Ct. 2005, 2007–08, 76 L.Ed.2d 143 (1983) (approving eighteen month delay in instituting forfeiture proceedings).

that the IRS levy rendered Guerra's Rule 41(e) motion moot.

On September 8, 1986, this Court heard oral argument on plaintiff's motion for the return and suppression of evidence pursuant to Rule 41(e). On September 23, 1986, this Court proceeded to trial on plaintiff's § 7429 suit. This Memorandum sets forth the Court's findings and conclusions with respect to both of these proceedings.

## II. JURISDICTION

■ Although the United States is not contesting jurisdiction in CV 86–2667, the Rule 41(e) proceeding, the issue merits brief consideration here. No statute grants jurisdiction in this type of proceeding, and the Rules of Criminal Procedure generally do not independently confer grant jurisdiction. However, the Supreme Court has several times suggested in dicta that where, as here, there is no criminal prosecution *in esse*, a suit pursuant to Rule 41(e) for the return of property is proper. *See United States v. $8,850*, 461 U.S. 555, 569, 103 S.Ct. 2005, 2014, 76 L.Ed.2d 143 (1983); *DiBella v. United States*, 369 U.S. 121, 131–32, 82 S.Ct. 654, 660–61, 7 L.Ed.2d 614 (1962). The Ninth Circuit, along with every other circuit to rule on the matter, has held that such a suit under Rule 41(e) is proper as an exercise of so-called "anomalous jurisdiction," but that such jurisdiction is equitable and should be exercised sparingly. *Meier v. Keller*, 521 F.2d 548, 554 (9th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976). Jurisdiction in CV 86–2405 is based on 28 U.S.C. § 1340 (1986 Supp.).

## III. THE RULE 41(e) PROCEEDING

### A. *IRS Assessments Against Illegally Seized Evidence*

Guerra claims that the law enforcement agencies involved in this case have played a kind of shell game with his money, and have kept the money even though they do not have enough evidence to prosecute him or secure forfeiture against him. Certainly the government's theory of the case against Guerra has been less than consistent. Originally, the government appears to have believed that Guerra was involved in cocaine sales. Later, it urged that he was involved in money-laundering. Now, it maintains that the termination assessment is justified on a cash-hoard theory.

Guerra chose to press his Fed.R.Crim.P. 41(e) challenge to the seizure of his money before he had a trial pursuant to 26 U.S.C. § 7429. As to the Rule 41(e) motion, Guerra maintains that the search of his apartment was illegal, that the United States is deemed to have adopted the illegality of the seizure of the money from his apartment, and that the transfer of his money from the Customs Service to the IRS should not affect the illegality of that seizure. Therefore, Guerra maintains, his property should be returned to him under Rule 41(e). Although much of what he says is correct, his conclusion is not.

■ The United States does not appear to contest the proposition that the search of Guerra's apartment was illegal, nor can it. Indeed, Guerra's moving papers in the Rule 41(e) proceeding prove this proposition without serious question. The affidavit supporting the search warrant at issue supplied probable cause for the search of several locations, but Guerra's apartment was not among them. According to the affidavit, no informant linked Guerra to cocaine sales or to any other kind of criminal activity. Surveillance revealed nothing suspicious about Guerra other than that he occasionally visited a business in which he was winding up a partnership interest, and he occasionally visited his nephew. That the police had good reason to believe Isidro Fernandez and Leon to be involved with drugs does not give rise to probable cause to believe that Guerra was involved with drugs as well. Associating with persons suspected of criminal activity does not, without more, give rise to probable cause that the associate is himself involved in

that criminal activity. *United States v. Rubio*, 727 F.2d 786, 794–95 (9th Cir.1983).[5]

▮ The United States also does not appear to contest the conclusion that the illegality of the local police's search of Guerra's apartment is imputed to the federal government. This conclusion is compelled by *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). When evidence is illegally seized by local authorities, that illegality is imputed to the United States in any subsequent federal prosecution. *Id.* at 208, 80 S.Ct. at 1439. Since the exclusionary rule applies to civil *in rem* forfeiture actions, Customs would have had to return the cash to Guerra, had the IRS not levied on it. *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965); *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

The government relies on the principle that it is perfectly proper for the IRS to levy on illegally seized goods and cash. *See United States v. Francis*, 646 F.2d 251, 262–64 (6th Cir.), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981); *United States v. Freedman*, 444 F.2d 1387, 1388 (9th Cir.), *cert. denied*, 404 U.S. 992, 92 S.Ct. 538, 30 L.Ed.2d 544 (1971). The courts' rationale in these cases has been that even if a court ordered the return of such cash, once it was in the hands of the taxpayer, the IRS could immediately levy on it. Of course, the prospect of the IRS effecting illegal searches and then forcing taxpayers to prove rightful ownership of that which was seized is troubling. *Cf. United States v. One Residence and Attached Garage*, 603 F.2d 1231, 1234 (7th Cir.1979). But, that problem is absent in this case, since it was the local police who conducted the illegal search.[6]

As the Supreme Court has noted, suppression is least effective when used to deter the misconduct of another sovereign. *United States v. Janis*, 428 U.S. 433, 455–58, 96 S.Ct. 3021, 3032–34, 49 L.Ed.2d 1046 (1976) (no exclusionary rule in civil tax proceedings).[7] *Janis* is indistinguishable from this case. Guerra contends that this case involves an intra-sovereign violation of rights, a situation which *Janis* expressly declined to consider. *Id.* at 456, 96 S.Ct. at 3033. This contention is factually incorrect. Like *Janis*, the illegal search in this case was conducted by local police. *Id.* at 434–36, 96 S.Ct. at 3022–24. Customs did not commit any illegality in this case; the illegality of the local police is only imputed to it. As in *Janis*, suppression in this case would do little to deter future illegal searches by the local police authorities. *Id.* at 458, 96 S.Ct. at 3034.[8] That the IRS

---

5. Since the government has conceded that the search of Guerra's apartment was illegal, this Court need not decide whether *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984), applies to Rule 41(e) motions. Nor must this Court decide whether the warrant in this case was so lacking in probable cause as to be invalid even under *Leon*. *Id.* at 923, 104 S.Ct. at 3421–22.

6. Guerra does allege that there is collusion between local police and the Customs Service, for the reasons discussed at note 4, *supra*. However, the Customs Service can only make use of legally seized evidence, since the exclusionary rule applies to its forfeiture actions. Therefore, the Customs Service has no incentive to encourage illegal seizures such as the one in this case. Guerra does not allege that the IRS is encouraging illegal searches and seizures by local authorities. Nor does he present any evidence that either the Customs Service or the IRS was in collusion with the Los Angeles County Sheriff's Department before the search in this case. There is no reason to believe that any agents of

the government were involved in this case before the search on January 28, 1986.

7. Guerra styles his motion as one for the return of evidence, but suppression cases are nonetheless relevant, because the effect of Fed.R. Crim.P. 41(e) is to bar the use of the returned evidence in subsequent proceedings. According to *DeMassa v. Nunez*, 747 F.2d 1283, 1286 (9th Cir.1984), suppression motions and motions for the return of evidence are interchangeable. Guerra concedes that the primary purpose of his Rule 41(e) motion is to bar the use of this money in any subsequent tax proceedings. This Court declines to speculate whether evidence returned under Rule 41(e) would in fact be inadmissible in a subsequent civil tax proceeding.

8. This result does not leave the local police totally undeterred from making illegal searches and seizures. A civil remedy against the local authorities is available under 42 U.S.C. § 1983 (1981).

levied on the money while it was in the hands of the Customs Service, rather than in the hands of the local police as in *Janis*, is a distinction without a difference.

Guerra urges the Court to exercise its supervisory powers to void the transfer of his money from the Customs Service to the IRS. He also urges that the IRS levy was improper while the money was *in custodia legis*, as a violation of the separation of powers. Neither of these arguments furnishes legal basis for relief. If the Court released the money pursuant to either of these theories, the IRS could immediately levy on the money as Guerra received it, thus effectively mooting the action of the Court.

## B. *Due Process and IRS Seizures.*

Guerra also analogizes to cases which have held that a seizure without a prompt post-deprivation hearing constitutes a denial of due process. *See, e.g., Stypmann v. City and County of San Francisco*, 557 F.2d 1338, 1344 (9th Cir.1977) (five day delay for hearing concerning seizure of car denies due process). This analogy is superficially attractive; like *Stypmann*, Guerra alleges that the seizure here has disrupted his ability to make a living. *Id.* at 1341–42. Indeed, Guerra alleges that the seizure has even disrupted his ability to hire a lawyer.

■ However, the courts use a balancing approach to determine when a seizure without a prompt post-deprivation hearing has ripened into a due process violation. *United States v. $8,850*, 461 U.S. 555, 569, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983) (calling into question previous Ninth Circuit cases on delays in forfeiture proceedings). Since *$8,850*, the Ninth Circuit has approved delays as long as twenty-one months between the seizure of money and the institution of forfeiture proceedings. *United States v. One 1954 Rolls Royce*, 777 F.2d 1358, 1361–62 (9th Cir.1985) *and cases cited therein*. The government's interest in the proceeds of criminal acts justifies seizures which do not lead to immediate indictments or forfeiture proceedings. *United States*

*v. Thirteen Machine Guns*, 726 F.2d 535, 536 (9th Cir.1984).

In any event, this case does not solely involve a delay in instituting forfeiture. (The government ultimately filed no forfeiture claim against Guerra and has conceded it will file none.) The government did promptly institute the tax proceedings at issue here. The termination assessment against Guerra was noticed within a week of the search of Guerra's apartment. Only the levy against Guerra's money was delayed. And since the IRS could have made this levy at any time after it noticed the assessment, it is hard to identify any prejudice which Guerra suffered from this delay.

Congress has created procedures to protect taxpayers from wrongful assessments. Under 26 U.S.C. § 7429, a taxpayer can bring suit as soon as sixteen days after a termination assessment to challenge that assessment, and can have his hearing in that suit within twenty days after filing. The Ninth Circuit has several times emphasized that challenges to IRS actions must be brought according to Internal Revenue Code procedures. *United States v. Freedman*, 444 F.2d 1387, 1388 (9th Cir.), *cert. denied*, 404 U.S. 992, 92 S.Ct. 538, 30 L.Ed.2d 544 (1971); *see also Kelly v. Springett*, 527 F.2d 1090, 1092 (9th Cir. 1975).

■ The thirty-six day waiting period provided in § 7429 is not a model of promptness. However, this Court is not prepared to disturb Congress' judgment that § 7429 sufficiently protects a taxpayer's due process rights against wrongful assessments. Indeed, even Guerra does not urge this Court to declare § 7429 unconstitutional. Since § 7429 was expressly created to provide a remedy for wrongful assessments, this Court holds that any challenge to an assessment must take place in a § 7429 hearing. Therefore, the Court holds that a plaintiff cannot employ Fed.R. Crim.P. 41(e) against the IRS in a civil tax proceeding, even where the IRS is alleged to be holding the claimant's funds illegally.

## IV. THE § 7429 PROCEEDING

In a hearing under 26 U.S.C. § 7429, the IRS has the burden of showing that its decision to make a termination or jeopardy assessment was reasonable. If the IRS carries its burden, then the taxpayer has the burden of showing that the amount assessed is inappropriate. The Court's decisions on these issues are final and unappealable. *Nichols v. United States*, 633 F.2d 829, 830–31 (9th Cir.1980). However, the summary hearing under § 7429 is not conclusive of the taxpayer's ultimate tax liability, which either party can litigate in a subsequent proceeding. *Haskin v. United States*, 444 F.Supp. 299, 304 (C.D.Cal.1977).

As is usual in these cases, the primary evidence which the United States offers in favor of its decision to make a termination assessment against Nicolas Guerra is the fact that $167,000 [9] was found in his apartment.[10] As noted above, the affidavit in support of the warrant does not raise any inference that Guerra was involved in illegal activity, or that he did not intend to pay his full 1985 tax liability when it was due.[11]

The government offers several other pieces of evidence in favor of its termination assessment. The first is Guerra's behavior during the search. After ten heavily-armed policemen and two police dogs entered Guerra's apartment and he was handcuffed to a chair, Guerra was presented with the money. Initially, Guerra, who appears never to have had any previous trouble with the police, denied any knowledge of the money. Later, when his wife came home, he seems to have wanted to save her from questioning, and he admitted that the money was his. The IRS cites Guerra's initial reluctance to admit to his ownership of the money as evidence of intent to conceal the money.[12]

Guerra raises the question of whether a statement made under the circumstances described above can be considered truly voluntary. The Court does not dismiss this question lightly, but it need not reach it. Guerra's conduct was within the scope of what in other circumstances is known as the "exculpatory no" doctrine. This doctrine recognizes that a confused, disoriented person under police questioning can sometimes be expected to deny something he ought to admit. *Cf. United States v. Medina de Perez*, 799 F.2d 540 (9th Cir.1986); *United States v. Rose*, 570 F.2d 1358, 1363–64 (9th Cir.1978); *United States v. Bedore*, 455 F.2d 1109, 1111 (9th Cir.1972). Guerra's momentary lapse of judgment is not sufficient to justify the termination assessment against him.

More importantly, the IRS alleges that in fact, despite the information contained in the affidavit presented to Judge Dorn, the Sheriff in fact had two confidential, reliable informants who implicated Guerra in cocaine dealing. The IRS claims that it knew of these informants when it made its assessment against Guerra. Parenthetically, the Court finds it strange that this information was not submitted to Judge Dorn by way of affidavit; but this Court never-

---

**9.** The IRS assessment was for just under $235,-000. On May 8, 1986, the IRS levied not only on the money held by the Customs Service, but also on money in Guerra's bank accounts. Though the IRS only claimed $235,000, it held $272,000 of Guerra's money throughout the summer. At the September 8 hearing, the government agreed to return the $37,000 in excess of what it claimed Guerra owed.

**10.** The government claims as further evidence in its favor the fact that much of the money was wrapped in aluminum foil for long-term storage, "to keep it from rotting," according to Guerra's statement during the search. The Court finds this somewhat inconsistent with the government's theory that the money was all earned in 1985.

**11.** The IRS noticed its termination assessment on February 3, 1986, before Guerra's 1985 taxes were due. The IRS claims that it believes that Guerra did not intend to pay his full 1985 taxes, and that if it waited for April 15, Guerra's money would have disappeared.

**12.** Obviously, Guerra's use of false ceilings to hide his money is evidence of an intent to conceal, but not necessarily evidence of an intent to conceal from the IRS.

theless will presume that these informants did in fact exist.

A hearing under 26 U.S.C. § 7429 is a summary proceeding, not subject to the rules of evidence. *Haskin v. United States*, 444 F.Supp. 299, 304 (C.D.Cal.1977). This Court allowed the government to present extensive hearsay evidence, both written and oral, in favor of its termination assessment. Much of this hearsay concerned the confidential informants who implicated Guerra and came from Sheriff's Deputy Eufrasio Cortez.

While this Court admitted Cortez's hearsay testimony, it did so with misgivings. Deputy Cortez did nothing to ease the Court's misgivings about his hearsay testimony. Cortez refused to discuss any details about previous occasions on which his confidential informants had proven either reliable or unreliable. He refused to disclose whether they had pending prosecutions, immigration holds, or past convictions. He refused to disclose if they were being paid, or had been promised leniency. He refused to discuss how they got their information or when or where they got it. This Court is mindful of the dangers which informants in drug cases face. But, with the testimony presented in this case, this Court can assign no weight at all to the facts allegedly supplied by the confidential informants. The Court was not persuaded that in fact these informants had communicated any information implicating Guerra in the activities of the cocaine ring.

The government also presents evidence that some local law enforcement agency conducted a trash search outside Guerra's apartment, and came up with evidence consistent with cocaine trafficking. At the hearing before this Court, Deputy Cortez claimed a privilege against disclosing the identity even of the law enforcement agency that supposedly conducted this search.

Cortez was equally unwilling to discuss the details of the search. It is also worth noting that the claimed results of this alleged search are inconsistent with the government's theory of the case. The government's confidential informants stated that Guerra was involved in money laundering for the Leon ring, not in actual cocaine trafficking. The garbage search allegedly found evidence consistent with large-scale cocaine packaging. In the absence of anything more than was presented here, this Court can assign no weight to the alleged results of this garbage search.

Guerra did not present any witnesses to demonstrate that the IRS assessment against him was unreasonable. However, he did present evidence, which this Court has taken into account. The IRS does not contest that for at least the past six years, Guerra has been a dutiful taxpayer and an increasingly successful businessman.[13] Further, this Court can and does take into account in assessing the government's reasonableness in this case the illegality of the search of Guerra, the unreasonable circumstances surrounding that search, and the government's successive transfers taken to frustrate Guerra's efforts to recover his money. Considering all of the evidence in this case, the Court finds that the decision to institute a termination assessment against Nicolas Guerra was unreasonable.

While the preceding finding is sufficient to dispose of the case, it is also instructive to examine the amount of the assessment which the IRS noticed against Guerra. One of the confidential informants in this case stated that he/she had understood that Isidro Fernandez was to go to Miami for the Leon ring to buy "up to twenty" kilos of cocaine.[14] The IRS assigned an arbitrary figure of $6,000 profit per kilo of this cocaine.[15] The IRS then arbitrarily

---

13. The IRS is correct that it would have been extremely difficult for Guerra to have saved the money at issue in this case between 1979 and 1984, given his reported income during that time.

14. As explained above, the Court does not assign credibility to the testimony about the confidential informants.

15. Neither Deputy Cortez nor IRS agent Rudy Carpio could state the source of this figure.

decided that the ring sold this twenty kilos of cocaine in a month [16] and that the ring had sold this twenty kilo amount *each* month in 1985. Finally, the IRS arbitrarily decided that Leon, Fernandez, and Guerra were the only people who shared in the profits of this ring, and that each of these three received one-third of the profits of the ring. From this calculation, the IRS found a 1985 taxable income for Guerra of just under $480,000, and a tax liability of almost $235,000.[17] The Court believes that this calculation illustrates the unreasonableness of the IRS's position throughout this case.[18]

Obviously, it is not every day that police find $167,000 hidden in false ceilings in an apartment. Certainly, it is arguable that such a sum in such a place raises an inference of questionable conduct of some kind. However, this set of facts could also be explained as the hoard of a relatively recent immigrant to this country who does not entirely trust banks, derived from an increasingly successful video business.[19] For all this Court knows, Guerra may well be involved in some sort of illegal activity; but, on the record before it, this Court finds that the IRS has not met its burden of demonstrating that it acted reasonably in noticing a termination assessment against Guerra.

IT IS THEREFORE ORDERED that the termination assessment against Guerra be set aside.

---

**16.** The IRS never explained the discrepancy between the "up to twenty" kilo figure provided by the informant and the "at least twenty" figure it used in calculating Guerra's assessment.

**17.** At oral argument, the IRS conceded that it could not defend the amount of its assessment against Guerra. Instead, the IRS urged that it had carried its burden of proof that it had acted reasonably in making some assessment, and that Guerra had not then carried his burden of proof to show that the amount assessed was unreasonable. Since Guerra had not affirmatively disproved the appropriateness of the amount assessed, the IRS urged that the amount should stand in its entirety.

**18.** Guerra contends that the IRS simply worked backward from the amount of money it found, and imputed to Guerra an income large enough so that the government would get to keep all the money. Without impugning the motives of the IRS agents in this case, this explanation does appear to account for the amount of the assessment.

**19.** It is at least possible that Guerra made some or all of this money legally in 1985, and that he intended to pay taxes on it when those taxes were due. The IRS terminated Guerra's 1985 tax year before he was required to file his 1985 tax returns. See note 11, *supra.*